Merrimack,
May 4, 1937.

### NEW YORK LIFE INSURANCE CO.

*v.*

### JOHN E. SULLIVAN, *Insurance Commissioner, & a.*

22

*Demond, Woodworth, Sulloway, Piper* and *Jones* (*Mr. Piper* orally), for the petitioner.

*Robert W. Upton* (by brief and orally), for the defendants.

PAGE, J.   While it will be necessary later to determine whether the payment annually of two per cent of premiums received by foreign

insurance companies is properly called a tax, it will be convenient to refer to the levy as such during a discussion of the legislative intent with respect to its scope.

There is a strong tendency in the decisions of other states, indeed they are virtually unanimous, to hold that a tax levied on life insurance premiums does not extend to receipts on account of annuity contracts. The decisions are based in part upon the theory that insurance cannot exist when the object of the contract is not indemnity or security against loss. *Commonwealth* v. *Insurance Co.*, 254 Pa. St. 510, 514. We are not called upon to decide whether this definition is generally correct, though it might possibly exclude some contracts which in common understanding and legal significance are regarded as contracts of insurance.

Nor is it necessary to decide between the alternatives presented by the majority and minority of the justices in *People* v. *Knapp*, 193 App. Div. 413 (affirmed, 231 N. Y. 630), where the decision of the question of taxability depended in large part upon whether emphasis were placed upon the differences between ordinary life policies and annuity contracts, or their likenesses. We think that the intent of our legislature may be gathered without recourse to any consideration mentioned.

The legislature early required each foreign insurance company doing business here to report annually its assets and liabilities, "the amount of premiums received during the year" in New Hampshire, and "the amount of losses paid therein." Laws 1868, *c*. 1, *s*. 48. The last two items were understood by the Insurance Commissioner to mean "all receipts and losses in the state." Report of Insurance Commissioner for 1871, page 141.

Under this act the New York Life Insurance Company, as well as others, reported the "Amount of premiums received during the past year in New Hampshire." Report for 1868, page 56. While acts passed prior to 1868 required similar returns, it would seem that they had not been fully complied with. Report for 1867, page 33. Nor did the companies at once fully comply with the act of 1868, as the reports for that year indicate. The returns that were complete, however, indicated that the foreign companies were taking much money out of the State.

"It has been suggested by many of our people that so large a sum of money as is drawn from this state by fire and life insurance companies for premiums . . . should be subject to some light taxation; and the Commissioner would recommend some legislation imposing

a small tax upon the premiums of both fire and life insurance companies . . . ." Report for 1868, page 123.

The immediate result was the enactment of Laws 1869, *c.* 13. By section 1 of this act, each foreign insurance company was required to report "the whole amount of premiums received in money . . . or any other substitute for money . . . for any insurance made by it on persons or property in this state," and to pay a tax of one per cent "on the amount so received by it."

This is substantially the language of the act of 1870, later to be noted, and of the present statute. If it be suggested that the language is different from that of the earlier act, and not so inclusive as to premiums, or that the act of 1869 was of narrower scope than the recommendation of the Commissioners, it may be replied that the contemporary understanding indicates no thought of exclusion of any premium received in this state. Thus the Insurance Commissioner wrote the year after the passage of the act of 1869: "It will be recollected that the Legislature of last year imposed a tax of one per cent. on the receipts of insurance companies of other states in this state." Report for 1869, page 142. And such, as we shall later see, appears to have been the practical construction.

The tax now in question originated when the act of 1869 was repealed and the similar act of 1870 was passed. Laws 1870, *c.* 1, *s.* 7. This provided that each foreign insurance company doing business in this state should pay an annual tax of one per cent on the whole amount of premiums received, in money or any substitute therefor, for insurance made by it on persons or property in this state during the preceding calendar year. By section 6 of the same act, every such company was required to report annually the full amount of premiums received by it during the preceding calendar year "for any insurance made by it on persons or property in this state."

The statute remained unchanged until 1889, when the legislature required the annual report to state the "whole amount of premiums received . . . for any insurance made by it on property located, or persons resident, in this State . . . ." For the moment, no change was made in the section imposing the tax. Laws 1889, *c.* 86, *s.* 3.

But in the revision of 1891 the legislature amended the law so that the tax was imposed upon the premiums received by foreign insurance companies "upon business done within the state" during the preceding calendar year. P. S., *c.* 169, *s.* 14. In its ordinary sense, the new language would naturally be taken to include annuity premiums. The petitioner argues, however, that the commissioners

who made the revision regarded the change in language as merely verbal, hence that the statute remained as exclusive as it interprets the act of 1870 to have been.

The argument will work the other way. Those who made the revision may have interpreted the act of 1870 as inclusive, not exclusive. In that case a change of language in form inclusive would indeed be merely verbal, and the commissioners and the legislature could not better express their understanding that the legislative intent had been inclusive for over twenty years. Which view we shall take of the "verbal" change must depend upon the circumstances surrounding the enactment of the laws of 1869 and 1870, already suggested, and upon what will later appear as to the practical construction of those acts prior to the amendment of 1889.

Since 1889 the levy upon its face has applied to contracts made by foreign companies upon property located here or with persons resident here, without respect, of course, to the place where the contracts were made. If this inclusive view be taken, the more limited language of the section as to reports must be interpreted to require returns of all premiums received by foreign life insurance companies upon all contracts with persons resident here.

Taking words in their natural meaning, the amendments to the section prescribing the levy have consistently and increasingly made evident an inclusive legislative intent. In 1899, the classification of foreign insurance companies began. The rate for fire and marine companies was fixed at two per cent upon the gross premiums, less certain deductions, while all other insurance companies (life included) were required to pay "a tax of one per cent upon the premiums received by it [them] upon business done within the state." Laws 1899, c. 64, s. 1.

Two years later, foreign fidelity and casualty companies were classed with fire and marine companies. All other foreign insurance companies (including life) remained subject to the same tax of one per cent. Laws 1901, c. 67. And so, also, it remained after the enactment of Laws 1905, c. 109.

By virtue of Laws 1909, c. 78, foreign life insurance companies were separately classified, and each was required to pay "a tax of two per cent. upon the gross premiums received by it upon business done within the state during said [preceding] year, less payments to residents of this state on account of death losses paid within the year; provided, however, that the tax assessed upon any such life insurance company shall not be less than an amount equal to one and

one-half per cent. of the gross premiums received by it upon business done within the state during said year." Laws 1915, c. 47, amended the provision last quoted by substituting for the words "business done within" the words "from residents of." With this amendment the act of 1909 became in the last revision P. L., c. 275, s. 60.

Thus it will be seen that the act of 1870, which the petitioner interprets as exclusive, has become, with some amendments, only one of which was striking, a levy of a tax which on its face is inclusive. And the single striking amendment proposed by the commissioners upon revision and adopted by the legislature of 1891 was "verbal" only and not intended to change the meaning of the act of 1870. No better answer could be found to the exclusive interpretation of the present act.

The practical construction of the statutes from 1870 on to the amendment of 1889 does not appear to have been different from that we have adopted. An examination of the reports of the Insurance Commissioners discloses nothing inconsistent with it and much that lends color to it. For example, the "whole amount of premiums received in the State during the year" appears to be the basis of the tax. Nor does it appear that any distinction was made between whole life premiums and annuity premiums. It is certain that no such distinction was made with respect to the total business of the companies, here and elsewhere. Report for 1871, pages 85, 87, 104, 105, 107, 113, 116, 135, 139. The commissioner described the levy as "A tax of one per cent. on gross premium receipts in this State." *Ib.*, 173.

Beginning with 1876, a table was published showing business in New Hampshire done by foreign life companies. Here may be found the number and amount of policies written and in force, the premiums received, and the losses, annuities and endowments incurred and paid. Report for 1876, page 32. Some years later the caption in this table referring to premiums became "total premiums received" while the payments mentioned became "losses and claims"; and another table appeared showing that in each case the tax was levied upon the total of such premiums. Report for 1887, pages xxxiii, xxxvi.

While total premium income included receipts from annuity business, as far as national transactions were concerned, disbursements likewise were so reported that payments to annuitants were included in the "total paid policy-holders." The term "policies" included annuity contracts, and "policies" were classified as whole life, endowment and "all other". *Ib.*, pages 123, 127, 132, 146, 151, 165, 198, 203.

The meaning of "whole amount of premiums," according to practical usage, at least as far as concerned the total business of the companies, foreign as well as domestic, is clear enough. The returns were on forms adopted by the National Insurance Convention (Report for 1871, page 148), and presumably expressed in practical ways the general understanding of words by both insurance commissioners and companies. Words would hardly have meant one thing with respect to total business and another thing with respect to New Hampshire business. The legislature of 1889 was presumably acquainted with the reports indicating no difference between premiums upon annuities and those upon other policies.

Taking the every-day use by companies, Insurance Commissioner and insurance conventions of the word "policy" for an annuity contract, of the word "premium" for its consideration, of "losses and claims" as including payments to annuitants as well as to beneficiaries after death of the insured, it would seem that the legislature of 1889, when requiring returns of the "whole amount of premiums received for insurance," meant to include annuity premiums in the term "whole amount of premiums received," in accordance with the customary local usage of those terms.

Webster's definition of insurance as an undertaking for indemnity, like technical legal definitions in decisions of the courts of other states, has little weight compared to practical usage. Loose understanding, popular and official, may have greater weight in statutory construction than the utmost refinement of definition. And though Webster does not mention the looser usage, there is no doubt that it does exist. Thus the Standard Dictionary recognizes what the plaintiffs argue is an impossible anomaly, and defines "annuity insurance" as "insurance securing the payment of a fixed annuity for the whole or a part of life, in consideration of a lump sum paid by the insured."

That our own legislature has so understood the matter may further be gathered from P. L., c. 272, s. 1 (III), which authorizes the formation of domestic corporations "for the purpose of conducting the following kinds of insurance business: .... On the lives of persons and every insurance pertaining thereto or connected therewith, including endowments, and to grant, purchase or dispose of annuities." But this is not necessary in order to reach our conclusion that the legislature intended to tax all premiums received from residents of New Hampshire by foreign life insurance companies.

Since our decision does not turn upon definitions that are highly

technical, we need not deal with arguments that annuities are far older than whole life insurance and that the earliest of all life insurance companies wrote its first policies in the form of contracts to pay annuities to widows. 1 Joyce, Insurance (2d *ed.*), s. VII. Historically interesting as the theory is, we do not find occasion to make use of it. But it is proper to remind ourselves that the common use of "premium" to describe the consideration of the annuity contract, and the use of the same term by the New York Life Insurance Company in its annuity contracts, is technically correct, and that it was recognized by legal authority more than a century and a half ago. Blackstone, Commentaries, Book II, 461.

Our conclusion is that to the extent that such premiums are paid by residents of New Hampshire, the foreign life insurance companies receiving them are subject to the tax imposed by P. L., *c.* 275, *s.* 60. We do not understand that it is denied that all foreign companies writing annuities in this State are life insurance companies within the accepted meaning of the term. Therefore the plaintiffs are subject to the payment of the annual tax.

The contention that the statute is unconstitutional as an attempt to classify persons for purposes of taxation—to tax insurance companies alone and not to tax individuals who write annuity contracts—appears not to rest upon good factual basis. In the absence of a finding of fact, we cannot assume that any non-resident individual is engaged in the business of writing annuities in New Hampshire, and conclude that the levy is discriminatory.

But there is a broader ground upon which the case should be put. A reference back to the circumstances surrounding the imposition of the "tax" in 1869 demonstrates that the situation which suggested the imposition has to do essentially with the terms upon which foreign insurance companies should be admitted to the State for the transaction of domestic business and the nature of the control to which they should be subject. These matters of admission and control had theretofore been subject to chapter 159 of the General Statutes, which was entitled "Foreign Insurance Companies and their Agents," and under the same title appear the present provisions for the "taxation" of premiums. P. L., *c.* 275.

As has already been noted, the "tax" originated in the suggestion of the Insurance Commissioner, prompted by "many of our people," that foreign insurance companies were drawing large sums of money from the State. "A small tax upon the premiums" was an obvious method of conditioning the transaction of domestic business by for-

eign corporations. This was all the more apparent, in view of the fact that premiums received by domestic companies became, at least in part, property subject to the annual tax upon estates. The foreign companies, however great their withdrawals of premiums, were immune to what was thus known strictly as taxation, and thereby they might be thought to enjoy a clear advantage in competition with domestic companies. While the statute called the imposition a tax, and while it was understood that revenue was an object (Report, Insurance Commissioner, for 1869, page 142), it was clearly recognized that there was "a broad difference, however, between money paid in premiums to a foreign insurance company and money paid in premiums to a home company." Report of Tax Commissioners, 1878, page 27.

The "tax" imposed in 1869, whatever its name, appears, at least until the constitutional amendment of 1903, to have been unsustainable as a tax. But it was sustainable as a condition for prosecuting business in New Hampshire in somewhat the same manner as the gasoline "tax" was conceived (Opinion of the Justices, 81 N. H. 552) to be properly levied as a toll for the use of the highways. With its first enactment, it became a substitute for certain provisions of the General Statutes, c. 159, already mentioned as relating to the control of foreign companies, and in all succeeding revisions it has been a part of the corresponding chapter. While incidentally a source of revenue, the imposition is to be considered as always having been primarily a means of control and not a method of taxation.

From this it follows that the levy in 1934 of the charge upon premiums for the years 1931 and 1932 was not the levy of a tax, but that it was an attempt to charge foreign corporations with their statutory fees due and payable for their leave to prosecute business here during those years. Whatever may be the rule with respect to the assessment of "back taxes," the companies owed the fees here assessed to the State. The petitioner has correctly pointed out the lack of statutory provision for late assessment of these charges which are common in case of the assessment of a tax. It is also to be noted that in other respects the legislature has not treated this as a tax. There is no provision for dooming in case of failure to make a correct return, and no penalty is observable for failure to pay other than the possible loss of the right to continue in business. The provision that assessment shall be made by the Insurance Commissioner on or before April first in each year (P. L., c. 271, s. 16) is merely directory. He is empowered to make no assessment except on the basis of returns

by the companies. The company that fails to make a full return of premiums leaves it beyond the power of the Commissioner to assess the charge correctly, hence the provision as to the date of assessment cannot be regarded as mandatory. All of the assessments here involved were valid.

*Judgment for the defendants.*

All concurred.