Racing Commission, } No. 3599.
June 27, 1946. }

NORTH HAMPTON RACING & BREEDING ASSOCIATION, INC.

*v.*

NEW HAMPSHIRE RACING COMMISSION.

*McCabe & Fisher* and *Morse & Grant* (*Mr. Grant* orally), for the plaintiff.

*Ernest R. D'Amours*, Attorney-General (*Gordon M. Tiffany*, Law Assistant, on the brief, *Mr. D'Amours*, orally), for the defendant.

*William P. Fowler*, (*Edward R. Hale* on the brief, **Mr. Fowler** orally), as *amicus curiae*.

Burque, J.   In the view we have taken of the present case it is wholly unnecessary to consider or determine the question as to whether or not *certiorari* is the proper remedy.   *Blake* v. *Railroad*, 39 N. H. 435, 436.   "All parties desire a decision. . . . In this situation, the questions have been considered without reference to any defect in the form of the petition."   *Barber* v. *Board*, 82 N. H. 426, 427. We granted *certiorari* because of the important question of law involved.   Having granted it and heard the parties on the merits of the issue raised therein, we proceed to the direct consideration of the case.   In so doing we do not wish to be understood, however, that we subscribe to plaintiff's claim that time is of the essence in this case. Time cannot be of the essence when dealing with a request that involves a permit to be allowed to conduct legalized gambling.   We are not moved by any motive to expedite a bringing about of any such undertaking.   Our purpose in the consideration of the case is simply to determine the authority of the defendant commission.

The statute involved is R. L., c. 171, entitled "Horse Racing."   It creates a commission (s. 8); to "make rules and regulations for the holding, conducting, and operating of all running or harness horse races or meets for public exhibition and for the operation of race tracks on which any such race or meet is held."   Section 9 provides that "no person, association, or corporation shall conduct, hold, or operate any running or harness horse race or meet for public exhibition without a license from the commission."

*S.* 10.   "License" provides that "any person, association, or corporation desiring to hold a running or harness horse race or meet for public exhibition shall apply to said commission for a license to do so."

*S.* 11.   "Issuance of License.   If the commission is satisfied that all the provisions hereof and the rules and regulations prescribed have been and will be complied with by the applicant, it may issue a license which shall expire on the thirty-first day of December."

The main question involved is whether the word "may" means "may" or "shall."   In other words, has the commission any discretionary power in granting or refusing to grant a license when, as plaintiff claims, the applicant has complied with all the requirements of the statute.   Except for the fact that the plaintiff, in its application, named in the alternative two places where the races might be held, and that in the questionnaire submitted by the commission, designed to elicit the information the commission sought to obtain as a preliminary requisite to the consideration of the application, Q. 6.: "State either on this petition or by supplemental statement, names

of officials to preside at the race meetings, together with salaries to be paid," is answered "not yet determined," no claim is made that the application was incomplete. We proceed on the theory that the commission did not consider that a defect in the application, for nowhere in the record nor in its findings does it appear that any such ground was relied upon for the refusal of the license. At the hearing before the commission plaintiff expressly and definitely waived its application for the location of the race track in North Hampton. Plaintiff rested its case on its application for a racing permit at a track to be located in Portsmouth. So we take it for granted in considering the merits of the case that plaintiff complied with all the requirements of the statute and of the commission relating to the necessary information to be submitted to it.

In construing a statute, standard principles of statutory construction are to be employed. " 'But as statutory language is not always given its broadest meaning, or a meaning which the context and subject-matter show was probably not intended (*Pierce* v. *Emery*, 32 N. H. 484, 508; *Carter* v. *Whitcomb*, 74 N. H. 482, 488), the evident intention of the Legislature as revealed by the act cannot be defeated by giving a single word in the statute an unnecessary meaning.' *State* v. *Dunklee*, 76 N. H. 439, 441. The police power is to be exercised in reason, and legislation in its exercise is to be construed reasonably, with due regard for its objectives. And the rule of reasonable construction invokes some measure of elasticity in broadening or narrowing the applications of statutory language. *Pierce* v. *Emery*, *supra; Opinion of the Justices*, 66 N. H. 629, 661." *State* v. *Richardson*, 92 N. H. 178, 181. "Words in a statute are to be construed according to the common and approved usage of the language, unless they have acquired a peculiar and appropriate meaning in the law, or from the context or manifest purpose of the Legislature it is apparent a different meaning was intended. P. S., *c.* 2, *ss.* 1, 2." *Opinion of the Justices*, 73 N. H. 625, 626; R. L., *c.* 7, *s.* 2.

"In construing a statute as mandatory or directory, the courts may take into consideration the consequences which would result from construing it as . . . mandatory." 50 Am. Jur. *p.* 49, *s.* 26. "The intention of the Legislature as to the mandatory or directory nature of a particular statutory provision is determined primarily from the language thereof. Words and phrases which are generally regarded as making a provision mandatory include 'shall' and 'must.' On the other hand, a provision couched in permissive terms is generally regarded as directory or discretionary. This is true of the word

'may'. . . . " *Id.*, *s.* 28. "It is the general rule that in statutes the word 'may' is permissive only, and the word 'shall' is mandatory." *State* v. *Wymore,* 343 Mo. 98, 109.

It has been held in this state that the word "may" confers discretionary powers. In *Belmont* v. *Parent,* 90 N. H. 249, 252, the court in construing the statutory powers of selectmen in granting or refusing to grant a junk dealer's license, said the word "may" meant discretionary. True it is that the statute, there being construed (P. L., *c.* 159, *s.* 1, now R. L., *c.* 190, *s.* 1) reads: "Selectmen . . . may, in their discretion, . . . license suitable persons to be dealers . . . and may determine and designate the place where the business is to be carried on. . . . " The issue was over the location of the junk yard and the court was construing the latter portion of the statute.

We are of opinion that the word "may" in section 11 of the law we are considering (R. L., *c.* 171) is intended to confer discretionary power to the commission in the exercise of its administrative governmental function in regard to the issuance of a license to conduct race meets. There are many reasons which prompt us to reach this conclusion. In the first place we are not dealing with an ordinary situation, with cases *e.g.* where the protection of public health is concerned, (*Cloutier* v. *State Milk Control Board,* 92 N. H. 199; *Whitney* v. *Watson,* 85 N. H. 238); where public interest and rights are involved and the public or third persons have a claim *de jure* (*Blake* v. *Railroad,* 39 N. H. 435); where insurance companies have complied with all the necessary requirements to qualify them to do business in the State (*U. S. Fidelity Co.* v. *Linehan,* 73 N. H. 41); and where the right of a party to engage in what is lawful business is concerned. (*State* v. *Moore,* 91 N. H. 16).

The statute confers upon one able to secure a license the right to conduct pari-mutuel horse racing. It legalizes what was previous to the enactment of the law a prohibited unlawful undertaking. As such it granted a privilege such as the State may grant or withhold at pleasure. *State* v. *Starrin,* 78 N. H. 220, 222; *Rosenblum* v. *Griffin,* 89 N. H. 314, 318. The statute deals with a private enterprise which, of its nature, is not only privileged, but which presents a social problem properly coming under the exercise and jurisdiction of the police power of the State and which requires strict regulation and supervision. That the party seeking the privilege may be required to pay for same, and to comply with all the requirements of the statutory law cannot be questioned. *Am. Baseball Club* v. *Philadelphia,* 312 Pa. 311. See Anno. 12 A. L. R. 1453. Likewise that the granting of

licenses for such privileged enterprise may lawfully be delegated to administrative public officials, clothed with the power to exercise discretion, even without prescribed rules of action, seems to be well settled. See Anno. 12 A. L. R. 1453; 54 A. L. R. 1115; 92 A. L. R. 418.

The commission is at least a *quasi* judicial body. (*State* v. *Stevens*, 78 N. H. 268, 270; *Whitney* v. *Watson*, 85 N. H. 238, 241), and its orders are not to be reversed unless arbitrary, capricious, unreasonable, based on improper motive, or in abuse of discretion. See Anno. 124 A. L. R. 249, 256. The presumption is that such a board acted within the reasonable scope of its power and discretion and the party complaining has the burden of showing that the board's decision rested on some ground that did not authorize the exercise of discretion. *Id.*, 255, 256. Plaintiff admits in its brief that "it may fairly be assumed that all proper decisions of the commission are intended for the best interest of the State." *Quaere* then, has the commission acted for the best interest of the State in its denial of plaintiff's application? In so doing has it acted arbitrarily, capriciously, unreasonably, based on improper motive, or in abuse of discretion? We think not. We find nothing in the record to indicate it did. Nothing the plaintiff has presented and argued to us would sustain the plaintiff's burden of proof in establishing either of the above particulars.

Plaintiff's claim is that the commission had no discretion in the matter of the issuance of licenses or denial of same; that plaintiff having met all the requirements of the statute and having given all the information demanded of it, it is entitled as a matter of law to have a license issued to it. We do not subscribe to this.

The statute, s. 10 (d), requires that the location of the race track is to be given in the application. The commission stated as its main reason for the denial of the application "that the granting of another permit to conduct horse racing with pari-mutuel wagering in the southeastern section of New Hampshire would not be for the best interest of the State." We rule that the commission has a perfect right to determine whether the proposed location of the track is a proper location. Why should the statute require the designation of the location of the track if the location is of no importance, as the plaintiff argues? If of no importance, the requirement is mere superfluity; likewise if not intended to give the commission necessary information and the right to pass on the suitability and advisability of the location. Certainly it must be the duty of the commission to determine whether the location is a proper and suitable one. If we accept plaintiff's contention an application for a race track license

may locate the track adjacent to churches, schools, institutions of learning, libraries, hospitals; in other words, wherever it sees fit without regard to surroundings. It may locate the track in the vicinity of homes, residential sections, summer resorts, etc., thus disturbing one's right to enjoy peaceful occupation of one's premises, obtained previous to the location of a race track, a *de jure* right, such a right as is referred to in *Blake* v. *Railroad, supra*, 437, and also depreciating established valuations of property and nullifying special purposes to which the property has been dedicated. No doubt plaintiff recognized this right when first it filed its application for an alternative location, one of which it waived after a storm of protest based on the above observations, thus recognizing that in view thereof the commission would not deem it was justified in granting a license to operate a track in that location. The *amicus curiae* in his request to be heard in opposition to the petitioner gives in his brief the names of ten persons, substantial property owners, whom he represents, and informs us further that he also is acting for forty other residents and property owners of the city of Portsmouth who are opposed to the proposed location of the track.

We are not informed, except in a general way, of the exact proposed location of plaintiff's track, nor as to the reason why the commission has decided "that granting of another permit to conduct horse racing with pari-mutuel wagering in the southeastern section of New Hampshire would not be for the best interest of the State." Plaintiff has not seen fit to ask the commission to amplify the statement and give its reasons therefor. We must therefore assume that the commission having the best interest of the State in mind had good reasons for reaching its conclusion. We cannot say there is no justification for it. Certainly there is no error of law involved. A review of the record discloses none. It does appear in the record that the promoters of this track rely on Maine people and vacationers as patrons for the success of their enterprise. Though not stated it may be assumed that they also rely on Massachusetts people. They do not rely much on New Hampshire residents for patronage; they admit that such patronage would not be sufficient to maintain the track and if relied upon mainly would bring about failure. The gambling element would be preponderantly out-of-State people. Can it be said that if the commission had that in mind it would not be good grounds for the denial of the application for a license? And if the commission decided such a situation was not for the best interest of the State, we cannot say they erred in so doing.

If plaintiff's position is pursued to its logical conclusion, the best interest of the State is not at stake; the commission need not take it into consideration. The only interest involved is that of the applicant and its prospective patrons. It may be noted that the plaintiff had no vested right needing protection when it applied for its license. It knew it had to get one before it could operate, and if it has made some investment and entailed some expense in preparation for the conduct of its enterprise, it took its chances. And certainly would-be patrons of the track have no interest to be protected. If we were to pass judgment on the advisability of protecting the interest of the gambling element we might be inclined to say that it would be for their best interest that there be no more opportunity to gamble on horse racing than what is already offered them.

The commission also gave as a reason that it recognized its responsibility in the assurance of a reasonable income to the State of New Hampshire from pari-mutuel wagering. Plaintiff argues that the commission had no right to take the question of revenue to the State in consideration as the act is a police measure and not a revenue one. There may be merit to this contention. The act however does make revenue a very important part of the legislation. It makes revenue so integral a part of the act that it is impossible to divorce and separate it from its policing features. It is a matter of common knowledge of which we can take judicial notice that the strongest argument and the main motivating factor in favor of and which brought about the enactment of the law originally was the promise of substantial revenue that the State would derive from the granting of the privilege to conduct pari-mutuel racing. Promises then made were more than fulfilled. The income derived therefrom has risen by leaps and bounds, way beyond all expectations, to such a vast extent in fact that the State budgets and appropriations are fixed in a great measure dependent upon the income to accrue to the State from that source. We hesitate to say that the legislation is purely policing; we are inclined to classify it as a combined revenue and police measure, and in that view find no criticism to make of the statement made by the commission that in refusing to issue the license, it recognized "its responsibility as a regulatory body in the supervision of pari-mutuel wagering on horse racing"; and "its responsibility in the assurance of a reasonable income to the State of New Hampshire from such racing."

The plaintiff argues further that the denial of a license to it results in the creation of a monopoly, in that it is tantamount to a ruling that one pari-mutuel race track in the State is enough. The commission

has made no such ruling; it has not said that one such race track is enough. It has simply said "that the granting of another permit to conduct horse racing with pari-mutuel wagering in the southeastern section of New Hampshire would not be for the best interest of the State." That is not saying that it would not grant a license for the operation of a like track in another section of the State. Though presently, and apparently in the non-determinable future the direct result of the commission's ruling is that there will be a monopoly in the southern part of the State, this is not saying that it is not in the best interest of the State that it be so. We cannot be called upon to rule differently. It is a matter of regulation which we say is in the hands of the commission.

The situation does not differ from what we find it to be in the "Spirituous Liquor & Beverages" act, R. L., c. 170. We find in section 31, "Application for License," the provision that the application shall state "that the proposed location of the business is an appropriate one, taking into consideration its surroundings and the number of similar licenses already issued in the neighborhood where the applicant's business is to be conducted." A like provision is incorporated in section 70 of the same act. In all cases where licenses are required, meaning in all instances where, outside of the State liquor stores, liquor is to be sold or manufactured, a license is required and it is invariably provided that the commission "may" issue. In so doing it is empowered to consider the reliability of the applicant or its managers, the location where the business is to be carried on, etc. No one would contend the commission has no discretionary power in determining who is qualified to hold a license and where and under what conditions the beverage is to be dispensed. Why should it be different with the race track commission act (which follows immediately that of the liquor commission) as to its power of discretion in the determination of the location of a proposed track? Both deal with acts which would be unlawful if not legalized by statute, and in that respect have great similarity. Discretion is just as necessary in the one as in the other. Both have the right to revoke for cause, and the right to revoke must necessarily connote the right to grant. There can be no compulsion in either.

*Petition dismissed.*

MARBLE, C. J., doubted the constitutionality of chapter 171 of the Revised Laws: JOHNSTON, J. concurred in the result: the others concurred.