Request of House of Representatives
No. 7494

OPINION OF THE JUSTICES

June 8, 1976

The following request of the house of representatives for an opinion of the justices was adopted on May 26, 1976, and filed with this court on May 27, 1976:

"Whereas, Senate Bill 62 originated in the New Hampshire Senate, was passed by that body and was sent to the New Hampshire House of Representatives for further action; and

"Whereas, Section 6 of Senate Bill 62 would impose a direct tax on pari-mutuel pools made at dog races, at varying rates ranging from 1⅔% to 10%, depending on the size of the pari-mutuel pool; and

"Whereas, Section 8 of the bill would restrict availability of the tax rates established in Section 6 of the bill to tax payers meeting 'all just and presently existing secured obligations,' to the satisfaction of the Attorney General; and

"Whereas, Section 9 of the bill would impose a direct tax on pari-mutuel pools made at harness horse races, at varying rates ranging from 4¼% to 9½%, depending on the size of the pool; and

"Whereas, the tax rates established for harness racing pari-mutuel pools in Section 9 of the bill differ from the tax rates established for dog racing pari-mutuel pools in Section 6 of the bill, and the rates established in Section 6 and 9 of the bill differ from the tax rates established for running horse race pari-mutuel pools in RSA 284:23, I;

"Now, therefore, be it Resolved by the House of Representatives that the Justices of the Supreme Court be respectfully requested to give their opinion upon the following questions:

"1. May those sections of SB 62 which would impose direct taxes on pari-mutuel pools be lawfully enacted, in view of the provision of Part II, Article 18 of the Constitution of New Hampshire, requiring that 'money bills' shall originate in the House of Representatives?

"2. May Section 6 of SB 62, which would impose a tax at varying rates on dog racing pari-mutuel pools, be lawfully enacted in view of the provisions of Part II, Article 5 of the Constitution of New Hampshire, relating to 'proportional and reasonable' taxation, or any other provision of the Constitution?

"3. May Section 8 of SB 62, which would condition the availability of the tax rates established in Section 6 on payment of private obligations, be lawfully enacted in view of Part II, Articles 5 and 6 of the Constitution, or any other constitutional provision?

"4. May Section 9 of SB 62, which would impose a tax at varying rates on harness racing pari-mutuel pools, be lawfully enacted in view of the provisions of Part II, Article 5 of the New Hampshire Constitution relating to proportional and reasonable taxation, or any other constitutional provision?

"5. May Section 6 and Section 9 of the bill, which impose rates of taxation for dog racing pools different from harness racing pools, and which together impose rates of taxation different from running horse race pools (RSA 274:23, I) be lawfully enacted, in view of the provisions of Part II, Articles 5 and 6 of the New Hampshire Constitution, or any other constitutional provision?"

The following answers were returned:

*To the House of Representatives:*

The undersigned justices of the supreme court submit the following reply to the inquiries contained in your resolution adopted on May 26, 1976, and filed with this court on May 27, 1976.

Your first inquiry is whether the sections of Senate bill 62 "which would impose direct taxes on pari-mutuel pools" may lawfully be enacted in view of the provision of the New Hampshire

constitution pt. II, art. 18 requiring "money bills" to originate in the house of representatives. The answer to this question is "Yes", since the proposed "taxes", or required payments "in lieu of taxes" (§ 6), so provided for, would not make the sections in question "money bills" within the meaning of the constitution. This is because they would not be "direct taxes" in the constitutional sense, and would not be taxes upon polls or estates. *Opinion of the Justices,* 101 N.H. 518, 131 A.2d 818 (1957); *Opinion of the Justices,* 102 N.H. 80, 150 A.2d 813 (1959); *Opinion of the Justices,* 115 N.H. 304, 339 A.2d 721 (1975). Moreover your question assumes that "direct taxes" would be imposed but the bill does not so state.

Your third question is whether section 8 of the bill conditioning the availability of tax rates established by section 6 of the bill (temporary rates for the conduct of dog races or dog race meets when pool does not exceed $40,000) may lawfully be enacted in view of part II, articles 5 and 6 of the constitution, or any other constitutional provision. Section 8 requires that such temporary rates shall not be available unless the attorney general is "satisfied that all just and presently existing secured obligations relative to the dog racing facility are being met". While the phrase "secured obligations relative to the dog racing facility" may be obscure and ambiguous, it might be assumed to refer to earlier provisions of the bill designed to assure that the person, association or corporation conducting such events is responsible, and enjoys sound financial backing. *Cf.* sections 2, 3, and 4. If so, we perceive no constitutional infringement in these provisions, which appear to have a firm foundation in the exercise of the police power of the State. *See North Hampton &c. Ass'n v. Commission,* 94 N.H. 156, 163, 48 A.2d 472, 477 (1946); *Opinion of the Justices,* 97 N.H. 533, 538, 81 A.2d 845, 850 (1951).

On the other hand, if the quoted expression is intended to refer to the status of obligations of the licensee (or of its lessor) which are secured by mortgage of the race track used by the licensee and facilities connected therewith, no justification is apparent for granting more favorable temporary rates to the licensee whose "secured obligations" are being met, while denying such relief to the licensee whose secured obligations are not being met. This provision can easily be made more specific and should be clarified.

Your remaining questions numbered 2, 4, and 5, ask whether

the provisions of sections 6 and 9 of the bill separately or in conjunction with RSA 284:23 I (Supp. 1975) may lawfully be enacted in view of articles 5 or 6 of part II of the constitution, or any other constitutional provision. These sections of the bill would exact payments from operators of dog racing pari-mutuel pools at varying rates depending upon the size of the daily pool, which would differ from varying rates similarly imposed upon the conduct of harness racing pari-mutuel pools, both of which schedules of rates would differ from the rate currently imposed by RSA 284:23 I (Supp. 1975) upon running horse race pari-mutuel pools.

The answers to these questions depend upon the fundamental nature of the exactions involved. We are here concerned with legalized gambling under license from the State, an activity preeminently calling for regulation under the police power. This was pointed out early in *North Hampton &c. Ass'n v. Commission*, 94 N.H. 156, 159, 48 A.2d 472, 475 (1946) where it was said: "The statute confers upon one able to secure a license the right to conduct pari-mutuel horse racing. It legalizes what was previous to the enactment of the law a prohibited unlawful undertaking. As such it granted a privilege such as the State may grant or withhold at pleasure. *State v. Sterrin*, 78 N.H. 220, 222, [98 A. 482, 483 (1916)]; *Rosenblum v. Griffin*, 89 N.H. 314, 318, [197 A. 701, 704 (1938)]. The statute deals with a private enterprise which, of its nature, is not only privileged, but which presents a social problem properly coming under the exercise and jurisdiction of the police power of the State and which requires strict regulation and supervision. That the party seeking the privilege may be required to pay for same, and to comply with all the requirements of the statutory law cannot be questioned." *See also Tamelleo v. Jockey Club*, 102 N.H. 547, 163 A.2d 10 (1960). As pointed out in *Maine State Raceways v. Lafleur*, 147 Me. 367, 87 A.2d 674 (1952), there is no constitutional right to engage in gambling.

The *North Hampton* opinion called attention to parallel considerations involved in the regulation of the sale of spirituous liquors, when it was said: "Both [statutes] deal with acts which would be unlawful if not legalized by statute, and in that respect have great similarity." *North Hampton &c. Ass'n v. Commission, supra* at 163, 48 A.2d at 478. In this connection, the court said in *Granite State Grocers Ass'n v. State Liquor Commission*, 112 N.H. 62, 66, 289 A.2d 399, 402 (1972): "The legislative motives in enacting economic and trade regulations, particularly in the regulation of

alcoholic beverages, may require less stringent scrutiny and justification than in other so-called personal rights decisions."

The *North Hampton* case *supra* recognized that the statute relating to the licensing of race tracks makes "revenue so integral a part of the act that it is impossible to divorce and separate it from its policing features." *North Hampton &c. Ass'n v. Commission, supra* at 162, 48 A.2d at 477. Obviously a substantial part of the exactions which would be imposed upon licensees under Senate bill 62 is properly imposed as license fees; and such fees, even when imposed in the regulation of businesses conducted as of right, may properly be classified, so long as the classification is not so arbitrary as to serve no useful public purpose. *Marine Corps League v. Benoit*, 96 N.H. 423, 78 A.2d 513 (1951). Moreover the fact that such fees produce incidental revenue beyond the expense of regulation and supervision does not render them unreasonable or invalid. *Laconia v. Gordon*, 107 N.H. 209, 219 A.2d 701 (1966); *see Hooksett Drive-In Theatre, Inc. v. Hooksett*, 110 N.H. 287, 266 A.2d 124 (1970); *Opinion of the Justices*, 112 N.H. 166, 170, 290 A.2d 869, 872 (1972).

To the extent that they are designed to produce revenue over and above the expense of supervision and regulation, they doubtless bear some characteristics of a tax, and in fact have been styled a "tax" by the legislation since its inception. Laws 1935, 27:15. It is our opinion that to the extent that they are purely revenue producing, as distinguished from reimbursement for costs incurred by the State, the exactions are more properly regarded as recompense for the exercise of the license privilege granted to the licensee, rather than a tax in the true sense of the word. Instead of being an "enforced contribution to provide for the support of government" *(Opinion of the Justices*, 115 N.H. 304, 305, 339 A.2d 721, 722 (1975)) the rates paid by the licensees are voluntarily assumed, and arise out of the state's "power to impose conditions upon grants [which is] not to be treated as the power to tax, as taxation is understood in this jurisdiction." *Opinion of the Justices*, 82 N.H. 561, 566, 138 A. 284, 287 (1927); *see New York Life Ins. Co. v. Sullivan*, 89 N.H. 21, 192 A. 297 (1937). As payment for the privilege of conducting legalized gambling, the rates which would be charged to licensees under sections 6 and 9 of the bill would not fall within the ambit of articles 5 and 6, part II of the constitution. "It does not follow because a license fee is large, or because it may become a part of the public revenue, that it is, therefore, a tax ... The legislature were evidently of the opinion that ... a large

license fee would tend to diminish the number . . . and improve the character of those licensed, and thereby secure to a greater degree compliance with all the regulations . . . ." *State ex rel. Troll v. Hudson,* 78 Mo. 302 (1883); *see* Annot., 103 A.L.R. 327 (1936); J. Humphreys and W. Basye, 3 Racing Law *passim* (1973).

No information before us would lead to the conclusion that the variation in rates between dog races, harness horse races, and running horse races referred to in your fifth question is necessarily arbitrary and without just reason. Obviously these enterprises are affected by a variety of factors which are not brought to bear in equal measure upon each of the three. *See Miami Beach Kennel Club Inc. v. Board of Business Reg.,* 265 So. 2d 373, 375-76 (Fla. App. 1972). The classifications made by sections 6 and 9 of the bill, and RSA 284:23 (Supp. 1975) are not unconstitutional on their face. *See State v. Garden State Racing Ass'n,* 136 N.J.L. 173, 54 A.2d 916 (1947).

As has been observed on other occasions, the question of the wisdom and desirability of proposed legislation rests with the legislature, not the judiciary. *Opinion of the Justices,* 110 N.H. 117, 122, 262 A.2d 290, 294 (1970); *Opinion of the Justices,* 111 N.H. 136, 143, 276 A.2d 821, 825 (1971).

Questions 2, 4, and 5 are answered "Yes".

Justice Griffith asks to be excused from expressing his views for reasons which might be thought to disqualify him. *See Opinion of the Justices,* 111 N.H. 210, 213, 279 A.2d 741, 742 (1971); *Opinion of the Justices,* 111 N.H. 131, 136, 276 A.2d 817, 820 (1971).

FRANK R. KENISON
LAURENCE I. DUNCAN
EDWARD J. LAMPRON
WILLIAM A. GRIMES

June 3, 1976.

George B. Roberts, Speaker of the House of Representatives, Marshall French, Majority Leader, and Chris Spirou, Minority Leader, by *Martin L. Gross,* of *Sulloway, Hollis, Godfrey & Soden,* filed a memorandum of law.

Ferd Corporation, by *Martin J. McMahon, Jr.,* of *Hamblett, Kerrigan, LaTourette & Lopez,* filed a memorandum of law.

Yankee Greyhound, Inc., by *Joseph A. Millimet* and *Silas Little,* of *Devine, Millimet, Stahl & Branch,* filed a memorandum of law.