MAINE STATE RACEWAYS ET AL.

*vs.*

ALEXANDER A. LAFLEUR, ATTORNEY GENERAL, ET AL.

Cumberland.    Opinion, April 1, 1952.

*Alexander A. LaFleur, Attorney General,*

*Philip F. Chapman, Jr., Assistant Attorney General,*
        for Attorney General and Running Horse Race
        Commission.

*Mayo S. Levenson,*
*Wilfred A. Hay,* for Maine State Raceways Et Al.
*Daniel C. McDonald, pro se,*
*Carl Beyer,*
*Milton A. Nixon,*
*Paul K. Stewart,*
          for Christian Civic League of Maine, Inc.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

MURCHIE, C. J. The complainants in this Bill in Equity, carried to this court on appeal, are Maine State Raceways, the owner of the equity in a running horse race track in the Town of Scarborough, in the County of Cumberland, Scarboro Holding Company, Inc., the holder of a mortgage thereon, in possession thereof with the consent of the mortgagor, and Scarborough Downs, the lessee and operator of said track at the time the process was commenced, under a license issued on January 5, 1951, pursuant to the provisions of P. L., 1949, Chap. 289, enacted as Chapter 77-A of our Revised Statutes.

The respondents are the Attorney General of the State, Alexander A. LaFleur, the County Attorney of the County of Cumberland aforesaid, Daniel C. McDonald, and Paul A. Dundas, Nathan H. Whitten and Frank H. Totman, the members of the Running Horse Racing Commission established by said Chapter 77-A, referred to hereafter as the "commission." All are named in their official capacities. Chapter 77-A vests the commission with authority to make rules and regulations for running horse races conducted under it, and for the operation of race tracks on which such races are held, within the state. It carries an express declaration that no such meet shall be permitted on Sunday. It imposes the enforcement of its provisions on the Attorney General "with the aid of the county attorneys of the

several counties," upon notification from the Commission of any violations thereof.

The issue presented is of transcendent importance. The process asserts, in effect, that it is not within the police power of the state to grant the privilege of gambling by the sale of pari mutuel pools in the conduct of harness horse racing at night to licensees under a law regulating such racing, and gambling, and deny that privilege to licensees authorized to conduct running horse racing under another law.

The issue is brought to a focus by the action of the single justice to whom the process was presented when filed, and who heard it five months later, in granting injunctions, both temporary and perpetual, restraining the Respondents from performing the functions assigned to them by said Chapter 77-A, as amended by P. L., 1951, Chap. 404. The amendment carried in the latter act prohibited the commission from licensing running horse racing to be conducted at night. Under Chapter 77 of the Revised Statutes, as amended by P. L., 1949, Chap. 388, the members of the State Racing Commission, established to license harness horse racing where pari mutuel betting is permitted, are expressly directed to license such racing at night. The name of that commission was changed to State Harness Racing Commission by P. L., 1951, Chap. 266, Sec. 95.

The temporary injunction was granted on July 20, 1951, a month prior to the effective date of P. L., 1951, Chap. 404. It was granted without a hearing, upon the filing of a bond by the complainants pursuant to the provisions of R. S., 1944, Chap. 95, Sec. 34. The perpetual injunction, the one brought in issue by the appeal, was granted on December 21, 1951, after the cause was heard on the bill, answers and replication. At that time the license held by Scarborough Downs when the process was commenced had expired ac-

cording to its terms and the clear mandate of Chapter 77-A.   The temporary injunction had effectively blocked the commission from revoking the license and the other respondents from prosecuting any violations of the amended law conducted in compliance with its terms.   The perpetual injunction is meaningless so far as the commission is concerned.   It purports, however, to enjoin any prosecution of the complainants, at least for infractions of the law prior to its issue.

It is alleged in the process, with many things not essential to a determination of the cause, that P. L., 1951, Chap. 404 is unconstitutional and void because it contravenes the Fourteenth Amendment of the Constitution of the United States and some unspecified provision of the Constitution and Bill of Rights of this state, and while the decision of the single justice carries no specific findings or rulings, it must be implicit therein that he has declared the law unconstitutional on one of the alleged grounds.

There is no provision in the Constitution of this state, of which our Bill of Rights is a part, which forbids the complete prohibition of gambling of any and all sorts within the state, or restricts the power of the legislature to permit it, in such limited form, and under such regulation or regulations, as it may deem for the welfare of the people, within the broad scope of legislative power vested in it by Section 1 of Article Four of the Constitution, Part Third.   We must assume, therefore, that the decision was based on a construction of the Fourteenth Amendment to the Constitution of the United States.

It has been asserted in this court on many occasions that that amendment does not prevent the proper exercise of the police power of the state, notwithstanding its prohibition of the abridgement of "the privileges or immunities of citizens of the United States" and its requirements concerning

"due process of law" and "equal protection." See *Jordan* v. *Gaines,* 136 Me. 291, 8 A. (2nd) 585, and the cases cited therein. The broad scope of the police power of the states has the full recognition, also, of the Supreme Court of the United States. See the *License Cases,* 5 How. 504, 12 Law Ed. 256, and particularly the statement of Justice Grier that:

> "It has been frequently decided by this court, 'that the powers which relate to merely municipal regulations, or what may more properly be called internal police, are not surrendered by the States, or restrained by the Constitution of the United States; and that consequently, in relation to these, the authority of a State is complete, unqualified, and conclusive.' Without attempting to define what are the peculiar subjects or limits of this power, it may safely be affirmed, that every law for the restraint and punishment of crime, for the preservation of the public peace, health, and morals, must come within this category."

This decision, made in 1847, antedates the writing of the Fourteenth Amendment, but the broad language quoted must be considered as forecasting later decisions that the police power of the states was not curtailed by its adoption. See *Barbier* v. *Connolly,* 113 U. S. 27, 5 S. Ct. 357; *Mugler* v. *Kansas,* 123 U. S. 623, 8 S. Ct. 273; and *Crane* v. *Campbell,* 245 U. S. 304, 38 S. Ct. 98. The two latter dealt with laws regulating the sale of intoxicating liquors, but it has never been denied, so far as we know, that gambling is equally a subject matter for police regulation. In that connection it may be well to quote Justice Grier once more, noting that his comment had to do with the form of gambling known as lotteries. In *Phalen* v. *Virginia,* 8 How. 163, 17 Curtis 539, 12 L. Ed. 1030, he said that:

> "Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries. The former are confined to a few per-

sons and places, but the latter infects the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple."

No lottery is here involved, but the complainants made it a point to prove factually in this case that gambling by pari mutuel betting on running horse races conducted at night attracted far larger crowds, and produced much heavier betting, than similar races held in the daytime, or harness horse races held at any time of either day or night. In the light of that evidence, there is no occasion for this court to take judicial notice, as it might, considering the gambling probes and prosecutions conducted in the state by both federal and state authorities in recent times, that gambling in connection with horse racing was involving many people and large sums of money.

Gaming, or gambling, the two terms being synonymous as lexicographers and legal texts assert, Webster's Universities Dictionary; 12 R. C. L. 707, Par. 2; 24 Am. Jur. 398, Sec. 2; 38 C. J. S. 51, Sec. 1, has always been the subject matter of regulation by legislation in this state. The first law dealing with it is found in Laws of 1821, Chap. XVIII. Pool selling, probably not known in early days, was expressly prohibited by P. L. 1877, Chap. 176. The provisions of the latter law are now found in R. S. 1944, Chap. 126, Sec. 1, the original terms thereof having been qualified in the 1944 revision of our statutes to safeguard such selling of pari mutuel pools as was authorized by Chapter 77 of the Revised Statutes aforesaid. The qualification written therein for that purpose is adequate to protect equally well corresponding sales conducted in connection with running horse races under Chapter 77-A. It does not extend beyond those two fields.

The allegations of the process assert also that the complainants have made a large investment in the construction

of their race track, relying on the right to operate running races and engage in the sale of pari mutuel pools in connection therewith, and, perhaps, to do so at night, although the evidence makes it clear that they conducted races in the daytime only, as is the mandate of P. L. 1951, Chap. 404, when their plant was first put in operation. Whatever the fact, it is true, as Chief Justice Waite said in *Stone* v. Mississippi, 11 Otto 814, 25 L. Ed. 1079, that:

> "the power of governing is a trust committed by the People to the government, no part of which can be granted away"

by a charter or license to corporations or individuals. Continuing, he said that although the state might create corporations, and vest them with certain rights, they were subject at all times:

> "to such rules and regulations as may from time to time be ordained and established for the preservation of health and morality."

The present appeal might be sustained, and the decree under review vacated, on a variety of grounds. One will be apparent on reference to the provision of Chapter 77-A, Section 6, authorizing the commission to:

> "make rules and regulations for the holding, conducting and operating of all running horse races and for the operation of race tracks on which any such"

races might be held under its provisions, and to the corresponding provision of Chapter 77, which vests similar authority in the commission established to deal with harness horse racing when pari mutuel betting is permitted. There can be no warrant whatsoever for any licensee under either law to believe that the commission issuing his license might not make such rules and regulations without reference to others made by any other, or that the rules and regulations of commissions established in connection with harness horse

racing, on the one hand, and running horse racing, on the other, must be uniform or standardized. Even less is there any foundation for a belief that the legislature which established the commissions, and had full authority to abolish either or both at will, surrendered any part of its authority to make regulations binding upon the commissions themselves, and all licensees operating under them, or either of them.

A second ground for sustaining the appeal, and vacating the decree, is found in another fact equally apparent by reference to the laws in question. This is that neither commission was given jurisdiction over all horse racing of the type dealt with by either within the state. No license whatsoever is required for anyone who wishes to engage in what the Bill of Complaint describes as "the business of running horse racing," or that of "harness horse racing," quoting again. The respective laws deal with such businesses only when the operators of them desire to conduct them "if pari mutuel betting is permitted." Chapter 77-A, Sec. 7; Chapter 77, Sec. 10. In the Bill of Complaint the references are to conducting the respective businesses "for profit," and the closing paragraph thereof makes it apparent that the underlying ground for the action lies in the fact, alleged and proved, that the "business of running horse racing," as such, cannot be conducted profitably. The evidence discloses clearly that the track operated by Scarborough Downs was conducted at a loss at all times, so far as the horse racing exhibited there was concerned. The profit derived from the operation of it came entirely from the sale of pari mutuel pools, which yielded a commission, fixed by the statute at 15% gross, adequate to meet the racing losses and provide a return on the property investment.

A more fundamental ground for sustaining the appeal and vacating the decree, and that upon which such action is taken, lies in the nature of the right complainants seek to

assert in claiming to be entitled, regardless of legislative decisions concerning public welfare, to engage in the sale of pari mutuel pools. Such privilege lies, with the sale of intoxicants, in a field wherein the police power of the state has always been recognized as controlling and inclusive. Sixteen months ago, in *Glovsky, Appellant,* 146 Me. 38, 77 A. (2nd) 195, this court had occasion to say that:

> "There is no inherent or constitutional right to engage in the liquor traffic, and whether one shall be permitted to exercise the privilege and under what conditions and restrictions, is a matter for the people to determine, acting by and through the legislature."

The same thing is true, equally, of gambling, in any form.

The legislature has seen fit to legalize gambling, in a limited and regulated manner, under Chapters 77 and 77-A of the Revised Statutes, and under Sections 21 to 27 of Chapter 126, dealing with the game of beano. The enactment of the laws therein carried constituted no surrender of its right to terminate the privileges granted at any time or to modify them in any manner it might see fit. No warrant can be found, in law or precedent, for the claim asserted by the complainants in this process, or for the issue of either the temporary injunction or the perpetual one. Under the circumstances, it is necessary that the cause be remanded for the issue of a decree dismissing the bill, and it seems appropriate that the decree of dismissal impose costs on the complainants.

*Appeal sustained.*

*Decree vacated.*

*Case remanded for the issue of a decree dismissing the bill with costs.*