**B. P. O. E. LODGE NO. 2043 OF
BRUNSWICK et al.**

v.

**Keith H. INGRAHAM et al.**

Supreme Judicial Court of Maine.

Dec. 11, 1972.

John P. Carey, Bath, Edward G. Hudon, Brunswick, Seymour Nathanson, Earl J. Wahl, Portland, John E. Harrington, Bangor, for plaintiffs.

Charles R. Larouche, John Kendrick, Asst. Attys. Gen., Augusta, for defendants.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, and WERNICK, JJ.

WERNICK, Justice.

These four cases, consolidated for purposes of appellate review,° involve fifteen subordinate lodges of the Benevolent and Protective Order of Elks and their asserted entitlements to be licensed by the State to sell intoxicating liquors for beverage use.

The State Liquor Commission has appealed from final Superior Court judgments in the form of permanent injunctions operating affirmatively, even though worded negatively, to compel the State Liquor Commission to renew the liquor selling licenses of the plaintiffs for the calendar year 1971.[1]

---

1. Although the injunctions purported to be permanent, their explicit thrust was confined to licenses for the calendar year 1971. This might suggest mootness since the appeals were not argued before this Court until April of 1972—after the calendar year with which the injunctions were concerned had terminated.

The issue, however, was clearly live when the actions were brought and the judgments entered. Under the criteria expressed in Good Will Home Association v. Erwin, Me., 285 A.2d 374, 380 (1971), "questions which . . . occur in a context which discloses . . . reasonable likelihood that the same issues will imminently and repeatedly recur in future similar contexts with serious impact upon important generalized public interests" are better candidates for decision,

The facts of three of the cases are basically the same. The fourth case, involving the Portland Lodge, presents minor factual variations.

Under 28 M.R.S.A. § 252 municipalities in which the lodges are located must give preliminary approval of applications for licenses to sell intoxicating liquor. In all but the Portland situation, such approval had been obtained. The Municipal Officers of Portland declined to approve the application of the Portland Lodge, and the decision had been appealed to the State Liquor Commission.

During hearing on the Portland appeal, on December 5, 1970, the Commission became aware for the first time that the National Constitution of the Order of Elks—stipulated at the oral argument before us to be binding on all subordinate lodges of the Order including the plaintiffs—restricted membership to "whites." At that hearing the Commission was further made aware of provisions of 17 M.R.S.A. § 1301-A, reading in part:

"No person, firm or corporation holding a license under the State of Maine or any of its subdivisions for the dispensing of food, liquor or for any service . . . shall withhold *membership*, its facilities or services to any person on account of *race*, religion or national origin, . . . ." (emphasis supplied)

Before the Commission had decided the appeal of the Portland Lodge, the plaintiffs in case No. 462, involving the Brunswick Lodge and eleven others (12 of the total of 15 plaintiffs), had sought, and obtained, on December 30, 1970 an ex parte temporary restraining order under which a Superior Court Justice restrained the Commission

"until January 8, 1971 . . . from failing or refusing to issue the liquor licenses applied for by the plaintiffs . . . ."

On January 6, 1971 (perhaps in an attempt to remedy what might have appeared to the Commission as premature judicial action), the Commission purported to deny issuance of licenses for 1971 to all the fifteen plaintiffs in the instant cases. The action was taken without public hearing other than that which had already been held as an incident of the appeal of the Portland Lodge.

As grounds for its denial, the Commission stated that the "whites" only limitation of the National Constitution, controllingly binding on each subordinate lodge, established "bad moral character" of the subordinate lodges. The Commission held its action justified under 28 M.R.S.A. § 55(8), which provides in part:

"In issuing or renewing licenses the commission shall give consideration to the character of any applicant, the location of the place of business and the manner in which it has been operated."

After the Commission's refusal to issue the licenses, three lodges (Portland, Gardiner and Bangor), not parties to the action in the Superior Court leading to the ex parte restraining order of December 30, 1970, commenced independent actions seeking permanent injunctions.

On January 28, 1971, a permanent injunction was granted in the first action brought by the Brunswick and eleven other

despite apparent mootness, than nonrecurring and nonpublic questions.

The lingering effects of the injunctions in these cases cause the underlying controversy to remain live. Although the records are silent as to the 1972 licenses, had the Commission refused to issue 1972 licenses, we should, no doubt, be finding in the records a second set of injunctions. It is clear that but for the 1971 injunctions the Commission *would* have under-

taken to deny the 1972 licenses; surely, the appeals have been taken because the Commission seeks to pursue the same policy which was responsible for denial of the 1971 licenses to plaintiffs. It would be empty formalism to insist that the Commission perform the act of refusing the 1972 licenses, and the Superior Court go through the motions of issuing a new set of injunctions, or amending the old ones, to save the cases from mootness.

lodges. The permanent injunction in effect compelled issuance of the 1971 licenses by the technique of enjoining the Commission from "failing or refusing to renew" them.

Once this permanent injunction had been issued, the plaintiffs and the State Liquor Commission (as the defendant) in each of the other cases stipulated that the issues of those cases were identical to those in the "Brunswick-twelve" case; and the State Liquor Commission then consented to the issuance of permanent injunctions in each of the cases

> "with the understanding that [the issues] shall be fully preserved for appeal to the Law Court."

The present appeals attack the correctness of the action by the Superior Court in issuing the permanent injunctions against the Commission. We hold that the Superior Court acted erroneously in issuing the injunctions because the State Liquor Commission was within its lawful authority in denying the renewal of the liquor licenses applied for by all of the plaintiffs in the four cases. We find it unnecessary to predicate our decision on the specific basis assigned by the Commission to support its actions—i.e., that plaintiffs had "bad moral character." We conclude, rather, that the Commission's ultimate denial of license renewals was justified under the avowed public policy of the State of Maine, as delineated in the provisions of 17 M.R.S.A. § 1301–A, and the authority afforded the Commission under that statute conjoined with the provisions of 28 M.R.S.A. § 55(8) allowing the Commission to take into account the "character" of the plaintiffs (independently of "morality" considerations) and the "manner" by which they have "operated."

I

Since 17 M.R.S.A. § 1301–A forms a cornerstone of our decision, we confront directly an attack levelled by plaintiffs upon its constitutionality, as applied to plaintiffs, insofar as it is asserted that 17 M.R.S.A. § 1301–A, applied to plaintiffs (all private clubs), improperly conditions the eligibility of a private club to have a license to sell intoxicating liquors upon the surrender by the club of its practice of arbitrarily restricting membership on the basis of racial origin or color of skin.

The nub of the position of plaintiffs is: (1) they assert that private persons have the rights—existing by implication from the guarantees of speech, religion and assembly expressly mentioned in the federal First Amendment, (NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed. 2d 1488 (1958)) and as "penumbrally" derived from various other aspects of the federal Bill of Rights, generally, (Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965))—to associate in private with whom they wish however arbitrary their choices; (2) these rights have been incorporated into the "due process clause" of the federal Fourteenth Amendment thereby to become protected against infringement by any State; (3) the same protections are afforded by the Constitution of the State of Maine; and (4) since 17 M.R.S.A. § 1301–A itself, and any State Liquor Commission action said to be authorized by its legal effectiveness, purports to extract from plaintiffs—as a price to be paid for entitlement to licenses for the selling in Maine of intoxicating liquors—that they must sacrifice their practices of conditioning membership on an arbitrary[2] discrimination predicated on racial origin or color, the statute, and Commission action

---

2. The discrimination in terms of racial origins or color, as here involved, is truly arbitrary since nothing in the general purposes sought to be promoted by the association suggests reason for, or need of, such discrimination to effectuate the purposes. Indeed, it is anomalous that an association dedicated, as the preamble of the National Constitution of the Elks' Order nobly proclaims, to "inculcate the principles of Charity, Justice, Brotherly Love and Fidelity" should simultaneously demand that "Membership in the Order is limited to white[s] . . . .."

resting upon it, violate both the federal Constitution and the Constitution of the State of Maine.

Since we consider the benefits to plaintiffs in the areas now under scrutiny to be no greater under the Maine Constitution than those afforded by the federal Constitution, we confine our discussion explicitly to the Constitution of the United States—the conclusions thus reached being held simultaneously controlling as to the Constitution of Maine.

The very formulation of the argument of plaintiffs reveals immediately that in 17 M.R.S.A. § 1301–A the State of Maine has not undertaken to act directly upon the activity of assembly as such—the acts of joining, forming or establishing associative bodies. This point becomes clear when we recognize that denial of the liquor licenses to plaintiffs does not deny plaintiffs opportunity to continue on associational structure in which non-"whites" are arbitrarily excluded as members of the association. The Elks lodges may continue to exist and arbitrarily to discriminate; they will, however, be unable to sell intoxicating liquors for beverage use.

Thus, it is a distinctly separate and independent activity *not* inherent in, or essential to, the associational structure of plaintiffs (although it might be important to their practical functioning)—the selling of intoxicating liquors—which is directly and immediately regulated by 17 M.R.S.A. § 1301–A.

We stress, further, that the selling of intoxicating liquors is not the kind of activity which must be carried on in private, either as a solitary private matter or in private association with others, to avoid frustration of its value (as, for example, the

activities dealt with in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L. Ed.2d 510 (1965) which pertained to the most intimate aspects of the conduct of husband and wife in the marriage relationship).

On the contrary, the activity of selling intoxicating liquors lies essentially outside the sphere of privacy or private entitlements. Individual human beings do not possess, ipso facto, or a priori—by virtue of their existence as natural creatures from whose consent alone government derives existence, authority and power—any rights to engage in the selling of intoxicating liquors. The activity is neither protected, specifically, in the Bill of Rights (federal or state) nor generally comprehended within the overall matrix of conduct which government may not absolutely prohibit but may only regulate.

■ Rather, because of the nature of intoxicating liquors and the enormous problems developed by the traffic in them, the police power of the State in this area of human activity has been recognized, consistently with any and all aspects of constitutional limitations, to be the most fulsome embodied in the concept of sovereignty. It is so plenary and untrammeled that the State may absolutely prohibit all selling whatever of intoxicating liquors for beverage uses; or the State may choose to allow the selling of intoxicating liquors for beverage use by confining it as an activity for government alone, a State monopoly, —denying it absolutely to any individual person acting in any private capacity or relationship.

As elucidated in State v. Frederickson, 101 Me. 37, 46, 63 A. 535 (1905) this principle has been recognized as operative in

---

This identification of the kind of discrimination on the basis of racial origin or color which is arbitrary, because without good reason relative to the fostering of legitimate purposes, is sought to be clarified in 17 M.R.S.A. § 1301–A itself. That statute establishes an exception for "organizations which are oriented to a

particular religion or which are ethnic in character." Underlying this exception is the rationale that in such instances there is a good reason for the discrimination in terms of the properly cognizable purposes of the association. It is, therefore, a discrimination not arbitrary and, hence, not invidious.

Maine as far back as the earliest days of statehood (as shown by the citation in State v. Frederickson of Lunt's Case, 6 Maine, 412). It has been reaffirmed more recently in Glovsky v. State Liquor Commission, 146 Me. 38, 41, 42, 77 A.2d 195, 197 (1950) in the following language:

"There is no inherent or constitutional right to engage in the liquor traffic, and whether one shall be permitted to exercise the privilege and under what conditions and restrictions, is a matter for the people to determine, acting by and through the legislature."

See also: Maine State Raceways v. LaFleur, 147 Me. 367, 374, 375, 87 A.2d 674 (1952).

Specifically as to the impact of the Fourteenth Amendment of the Constitution of the United States, it was said in Opinion of the Justices, 132 Me. 512, 518, 174 A. 853 (1933), quoting language of the Supreme Court of the United States in Crane v. Campbell, 245 U.S. 304, 38 S.Ct. 98, 62 L.Ed. 304 (1917):

" 'It must now be regarded as settled that, on account of their well-known noxious qualities and the extraordinary evils shown by experience commonly to be consequent upon their use, a State has power absolutely to prohibit manufacture, gift, purchase, sale, or transportation of intoxicating liquors within its borders without violating the guarantees of the Fourteenth Amendment. . . . We further think . . . that the right to hold intoxicating liquors for personal use is not one of those fundamental privileges of a citizen of the

United States which no State may abridge.' " [3]

In the exercise of its extraordinarily plenary police power to prohibit, or control and regulate, the sale of intoxicating liquors within its borders the State of Maine has established a program in which, fundamentally, the State has monopolized all retail selling of intoxicating liquors for beverage consumption—eliminating all entitlements of private persons or enterprises subject to only two general exceptions: (1) private persons, associations, firms or corporations may be licensed to operate as retail stores purchasing from duly licensed wholesalers and reselling malt liquor or table wines, or both, in the original containers for consumption off the premises only; and (2) under appropriate licensing controls the selling of

"spirituous and vinous liquor and malt liquor to be consumed on the premises where sold"

is authorized for

"clubs and . . . bona fide hotels, restaurants, vessels, railroad dining cars and airlines . . .." 28 M.R.S.A. § 801, as amended.[4]

Even though it could have entirely prohibited, the State has thus chosen to allow a minor degree of participation by private persons in the selling of intoxicating liquors for beverage use. In thus permitting any incident of private action to attach, the State has, in addition, elected to strive to ensure, by the applicability of that portion of 17 M.R.S.A. § 1301–A relating to "liquor", that invidious discrimination on the basis of racial origin or color of skin

3. By the provisions of the Eighteenth Amendment to the Constitution of the United States the federal government temporarily superseded the States as the repository of the absolute police power control over the sale of intoxicating liquors for beverage purposes. By the Twenty-first Amendment to the Constitution of the United States, however, such absolute police power control as previously had been asserted by any State sovereignty was reinvested in it.

4. There appears to be another minor exception not here of consequence which allows additional licensing for the conduct of "off-premises" sales of intoxicating liquors "at planned events or gatherings to be held at locations other than the licensed premises . . . ." (28 M.R.S.A. § 801–A)

shall play no part in any selling in Maine of intoxicating liquors for beverage use.

Notwithstanding that the State could have prohibited all private participation in its program for the selling of intoxicating liquors, plaintiffs complain that the State, insofar as it has purported to make the strictures of 17 M.R.S.A. § 1301–A applicable to them as private clubs, has unreasonably abridged their claimed constitutionally protected freedom, as private persons, to associate in private with others as they see fit.

■ The constitutional issue is thus crystallized. It is whether the State requirement bears "some rational relationship to a legitimate state purpose." Weber v. Aetna Casualty & Surety Company, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

Since the State of Maine has absolute power to remove the activity of the selling of intoxicating liquors entirely from the sphere of private participation, clearly, we are *not* here concerned with an area of activity in which, as indicated in some recent decisions, "sensitive and fundamental . . . rights" may be deemed to be capable of attaching, or even of being approached, such that the strictest kind of judicial scrutiny must be indulged before any particular exercise of State control, or regulation, will be allowed as constitutionally permissible. See: Weber v. Aetna Casualty & Surety Company, supra.

Rather, we are in a zone of activity governed by the traditional criterion for ascertainment of compliance with both the "equal protection of the laws" and "due process" clauses of the Fourteenth Amendment,—whether any rational relationship to a legitimate State purpose may be reasonably conceived. McGowan v. Maryland, 366 U.S. 420, 425, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

The decision in Crane v. Campbell, supra, shows that, specifically in relation to the selling of intoxicating liquors, such is the test to be applied. The opinion stated categorically:

"As the state has the power . . . to prohibit, it may adopt such measures as are reasonably appropriate or needful to render exercise of that power effective" (p. 307, 38 S.Ct. at p. 99);

and, therefore, the inquiry is whether the State's action is

". . . arbitrary and unreasonable or without proper relation to the legitimate legislative purpose." (pp. 307, 308, 38 S. Ct. at p. 99)

The same principle was also stated, and most cogently applied, in Goesaert v. Cleary, 335 US. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948).

With the basic constitutional question here being raised thus definitively formulated, it is of importance that we clarify the profound difference between the issue now before us and the constitutional question raised, and recently decided by the Supreme Court of the United States, in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (June 12, 1972).

In Moose Lodge v. Irvis it was held that the "equal protection of the laws" clause of the Fourteenth Amendment does not *compel* a State to *require* (in the event the State has refrained from making such choice) the termination of a private club's practice of discriminating arbitrarily on the basis of racial origin or color in its sale of intoxicating liquors for beverage use;[5] and that this remains true notwith-

---

5. In Moose Lodge v. Irvis the arbitrary discrimination to which the decision applied concerned the club's selling of intoxicating liquors for beverage use to the guests of members. The Court did not reach consideration of the effect of an arbitrary discrimination in the membership policy as such.

For present purposes since, as our discussion will show, we find the issue now before us entirely different from that posited in Moose Lodge v. Irvis—either

standing that the State, in allowing the private club to participate in the State's comprehensively regulated program for the sale of intoxicating liquors for beverage use, had undertaken intimate and pervasive supervision, control and regulation of the activities of the private club as a licensed seller.

Moose Lodge v. Irvis decided that the relationship therein created between the State and the private club had not been shown to be so "symbiotic" that the State had become

"in any realistic sense a partner or even a joint venturer in the club's enterprise"

such that the

"discriminatory guest policies of Moose Lodge [would] . . . make the latter 'State action' within the ambit of the Equal Protection Clause of the Fourteenth Amendment"

—thereby to compel that the State demand the cessation of such discriminatory practices as to guests.

The issue before us is entirely different. We start with the premise that the club's arbitrary discriminatory membership policy remains private action and is not State action subject to the mandates of the "equal protection of the laws" clause of the Fourteenth Amendment. Here, the question is, rather, whether the Fourteenth Amendment *prohibits* the State from making the *choice*, in the exercise of the enormously plenary police power it has to control the sale of intoxicating liquor within its borders, to deny issuance of liquor licenses when the effect of the issuance will be the introduction of invidious discrimination on the basis of racial origin or color into the selling in Maine of intoxicating liquors for beverage uses.

Once this difference of issue between the present case and the decision in Moose Lodge v. Irvis is thus plainly elucidated, it

becomes apparent that Moose Lodge v. Irvis is not only without controlling precedential effect but lacks even guiding significance as a source of principle to govern the decision of the present case. Manifestly, various factors and relationships, not sufficient to *compel*, may provide adequate *rational* basis for a State's policy *choice* to achieve elimination of any connection between invidious discrimination on the basis of racial origin or color in the selling of intoxicating liquors,—such that the State's public policy becomes constitutionally *permissible* even if not constitutionally *compelled*.

Here, even as applied to plaintiffs, the rationality,—and, hence, constitutional permissibility consistent with the federal Fourteenth Amendment,—of the State's requirement, is shown, first, by the consideration that the restrictive membership practices of the plaintiffs on the arbitrary basis of racial origin or color do not function as merely abstract characteristics of the association; they have *tangible operative effect upon the selling process itself* since the law of Maine allows a licensed private club to sell intoxicating liquors (for consumption on the premises and not elsewhere) *only to the members* of the club and accompanying *guests of members*; and fraternal organizations and social clubs, such as plaintiffs, may sell also to

"members of the same national or affiliated international organization and to members of auxiliaries of the same national or affiliated international organization and their guests accompanying them." 28 M.R.S.A. § 805

Thus, the restrictive membership requirement of the Constitution of the Benevolent and Protective Order of Elks of the United States of America contained in Article VII, Section 4, that:

"Membership in the Order is limited to white[s] . . .",

as to membership policy or as to practice in selling to guests of members—we need not, and do not, rely upon any possible difference in result, concerning the kind of issue raised in Moose Lodge v. Irvis,

which might have been forthcoming had the Court directed its attention to discrimination in membership eligibility rather than in the sale of liquor to the guests of members.

together with the provisions of Article VII, Section 1, that:

"A Subordinate Lodge can be instituted only as provided in . . . [the Constitution]"

—and as stipulated at the oral argument of this case having binding effect as law upon each subordinate Lodge including those. which are plaintiffs in this case—is directly transposed to have operative practical consequences, in some measure, upon the opportunities of persons in Maine to purchase intoxicating liquors for beverage purposes. To the extent that there is restriction in the membership of the plaintiffs on the arbitrary basis of race or color, to that extent some human beings in the State of Maine, arbitrarily because of their racial origin or color, are, ipso facto, excluded from opportunity, which they might otherwise have had, to purchase intoxicating liquors for beverage purposes.

Whether this arbitrary limitation of opportunity produces a relatively major or trivial restriction upon the availability for purchase by non-white persons in any given area of the State of Maine is, for present purposes, immaterial. Of critical importance, rather, in terms of the rationality of the State's public policy, is whether race or color of skin produces *any arbitrary restrictions whatever* in the selling of intoxicating liquors in Maine.

It is surely a rational objective in the merchandising of any commodity to seek to ensure that each and every dollar shall have a potential for purchase unaffected by the factor—totally irrelevant in the buying and selling of commodities, and, therefore, arbitrary in such context—of the skin color or racial origins of the person in whose hands a dollar reposes.

It is thus police power regulation which is rational, rather than arbitrary and capricious, that, insofar as the State elects to allow private persons to participate in the selling of intoxicating liquors for beverage use—an activity over which the State has

the fullest power of control recognized to inhere in sovereignty,—the State declares as its own policy choice that all shall conform to a principle uniformly sought to be established, and upon which the State itself is constitutionally obliged to pattern its own action, that the skin color or racial origin of the person who owns or possesses a dollar shall not affect the power of that dollar to purchase intoxicating liquors for beverage uses wherever such liquors are sold in the State. Cf. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

A further consideration establishing the rationality of the State's choice of public policy as embodied in 17 M.R.S.A. § 1301–A—and even as it applies to plaintiffs as private clubs—derives from the very nature of the State's police power relative to the sale of intoxicating liquors, indeed, precisely its essentially unfettered plenitude.

By exercise of its acknowledged police power absolutely to exclude—or, derivatively, pervasively and strictly to regulate and control through licensing—all private relationships to the retail selling of intoxicating liquors for beverage uses within its borders, the State of Maine has opportunity to ensure the elimination from such enterprise of all potential for arbitrary discrimination on the basis of racial origin or skin color.

Were the State, possessed of such fulsome police power and legitimate opportunity in the premises, to omit to take the action, embodied in that portion of 17 M.R.S.A. § 1301–A dealing with liquor—by which, even-handedly, the State has denied eligibility for a license to sell intoxicating liquors for beverage uses to any and all persons, firms or corporations practicing arbitrary discrimination on the basis of racial origin or skin color—fair-minded citizens could, with reasonable justification, believe that the State was condoning and indirectly encouraging invidious discrimination.

It is, therefore, rational,—a regulation reasonably tending to promote the State's legitimate interest in preserving its own dignity and nobility before its citizenry—that the State, in a domain of activity in which it has the most plenary measure of police power available to the sovereign, should choose to formulate a public policy geared to avoidance of the image, or appearance, of acquiescence in, or condonation or encouragement of, practices which discriminate arbitrarily and invidiously on the basis of racial origin or color.

Were we to hold that such effort by the State, (regardless of whether it is constitutionally *compelled*) is constitutionally *prohibited* by the Fourteenth Amendment of the Constitution of the United States, we ourselves should be perverting and mocking the Fourteenth Amendment. In the language of Mr. Justice Frankfurter, concurring in Railway Mail Association v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945):

> "To use the Fourteenth Amendment as a sword against such State power would stultify that Amendment. Certainly the insistence by individuals on their private prejudices . . ., in relations like those now before us, ought not to have a higher constitutional sanction than the determination of a State to extend the area of non-discrimination beyond that which the Constitution itself exacts." (p. 98, 65 S.Ct. at p. 1489)

The provisions of 17 M.R.S.A. § 1301–A, as applied to plaintiffs in the context now before us, are not unconstitutional as improper governmental abridgement of plaintiffs' freedom of association or rights of privacy.

## II

As an additional contention of constitutional deficiency, plaintiffs complain of the exception allowed by 17 M.R.S.A. § 1301–A for

> "organizations which are oriented to a particular religion or which are ethnic in character."

Their claim is that the exception violates the "equal protection of the laws" clause of the federal Fourteenth Amendment since it is itself a "discrimination"; some associations are permitted to have liquor licenses notwithstanding that they engage in restrictive membership policies while others are denied such licenses because they practice restrictive membership discrimination.

Even if it be assumed, arguendo, that plaintiffs, themselves unaffected by the exception, might have standing to attack its constitutionality (on the theory that the exception renders the entirety of 17 M.R.S.A. § 1301–A unconstitutional on its face), the contention of plaintiffs lacks merit.

■ The complete answer to it has already been indicated in footnote 2 at page 7, supra. The fallacy of the argument is that it fails to recognize the differences between: (1) restrictive membership discriminations which are arbitrary, because without rational relationship to the fostering of the legitimate purposes for which the association has come into being, and (2) those which rationally promote such lawfully cognizable objectives. The "equal protection of the laws" clause of the federal Fourteenth Amendment nullifies only State action which produces the irrational—the arbitrary—and, therefore, invidious discriminations.

■ This distinction suffices to establish the constitutional validity of the exception in 17 M.R.S.A. § 1301–A for

> "organizations which are oriented to a particular religion or which are ethnic in character."

Since such organizations are formed to promote lawful objectives which their members share as common interests by virtue of their religious or ethnic identities, their confining of membership to persons who bear the same religious or ethnic identity is a rational classification. It thus lacks the arbitrariness by which discrimi-

nation becomes invidious and which is outlawed by the "equal protection of the laws" clause of the Fourteenth Amendment of the Constitution of the United States when it is the result of State action.

The exception as here recognized by the State of Maine is, therefore, consistent with the federal Fourteenth Amendment.

### III

■ Plaintiffs in the three cases other than that of the Portland Lodge, had presented in their briefs an argument that the Commission had violated procedural due process requirements because it had denied renewal of their licenses without affording them a prior hearing.

Because of various stipulations throughout the proceedings, including some made during the oral argument before this Court, the claim must be held to fail.

We interpret the stipulations which produced the State Liquor Commission's consent to the issuance of a permanent injunction in the case of the Portland Lodge— that the issues in it were identical to those in the other cases such that the cases could stand or fall on the same basis,—to signify that the hearing afforded to the Portland Lodge, on its appeal to the Commission from the disapproval of license by the Portland Municipal Officers, would serve as the equivalent of a hearing for all of the plaintiffs. Furthermore, in light of the same stipulation establishing the identity of issues, the curative effect of the hearing which was afforded in the Superior Court to the "Brunswick" group of twelve lodges could well suffice to have satisfied procedural due process for all plaintiffs presently before us. See: Bourjois, Inc. v. Chapman, 301 U.S. 183, 57 S.Ct. 691, 81 L.Ed. 1027 (1937).

Finally, it was stipulated at oral argument before us that the

"Constitution and Statutes Annotated of the Benevolent and Protective Order of Elks of the United States of America (Reissue of 1971)"

was part of the record. Section 144 of those statutes states:

"No person shall be accepted as a member of this Order unless he be a white . . .."

It was further stipulated that this restriction had the binding effect of controlling the membership practices of all subordinate lodges, including the plaintiffs.

By all the above stipulations the parties other than the Portland Lodge have (1) confirmed as applicable to them the findings of fact made by the Commission in the hearing afforded the Portland Lodge and (2) have agreed that no other factual determinations are relevant to the substantive issues which they seek to have decided. They have, therefore, effectively waived, for present purposes, all legal significance which might otherwise attach to the omission of the Commission to have provided them a fact-finding hearing before it denied the renewal of their licenses.

A similar approach provides the answer to any claim that plaintiffs should have been afforded opportunity to have been heard before the Commission on the substantive issues of law, even though the factual questions had been resolved. The hearing afforded in the case of the Portland Lodge, together with the hearing in the Superior Court which had been given to the "Brunswick" group of twelve lodges, all combined with the stipulation by the plaintiffs that all cases present identical substantive legal issues for appellate review, suffice to establish that in the totality of the proceedings below, plaintiffs, to the extent they had not waived, had been afforded adequate opportunity to raise and have decided the substantive legal issues now being presented to us on appellate review.

### IV

■ There remains the question of whether the Superior Court was correct in

adjudicating that the State Liquor Commission had acted in violation of the laws of Maine by denying the renewal of licenses to plaintiffs to sell intoxicating liquors in Maine.

The Commission's legal approach consisted in treating the arbitrary restrictive membership policy which the plaintiffs were bound to practice as a violation of the public policy of the State of Maine embodied in 17 M.R.S.A. § 1301–A; and the Commission relied upon such violation as establishing a "bad moral character" of the plaintiffs sufficient to authorize a denial of the license renewals under 28 M.R.S.A. § 55(8).

Plaintiffs maintain that this approach by the Commission was a misuse of 17 M.R.S.A. § 1301–A as well as of 28 M.R.S.A. § 55(8). Plaintiffs claim that (1) 17 M.R.S.A. § 1301–A may not be used as the source of a generalized State public policy utilizable in conjunction with any other statute—specifically to provide a "feeder" foundation for the denial of liquor license renewals under 28 M.R.S.A. § 55(8), and (2) in any event, this latter statute was misused by the State Liquor Commission to the extent that the State Liquor Commission purported to attribute "bad moral character" to an association, as such, in contradistinction to the "moral character" of the particular human beings who might have constituted the association.

We decide that the Commission's reliance upon the policy manifested by 17 M.R.S.A. § 1301–A,—and notwithstanding that the statute prescribed within its own confines a remedy for implementation of the announced policy,—to allow the Commission to utilize another remedy under 28 M.R.S.A. § 55(8), i. e., the denial of the renewal of plaintiffs' liquor licenses, was correct.

The provisions of 17 M.R.S.A. § 1301–A apply in terms to the plaintiffs insofar as they would purport to be

"holding a license under the State of Maine . . . for the dispensing of . . ., liquor . . ."

and they

"withhold membership, . . . to any person on account of race . . ."

(the membership limitation to "whites" being fairly held a limitation to those of the Caucasian race). Hence, it is immaterial to the applicability of 17 M.R.S.A. § 1301–A that plaintiffs do not operate as places of public accommodation.

We consider that a State agency directed to take into account in the determination of an applicant's qualifications to have a liquor license factors such as the applicant's manner of operation and "character",—(which, in our judgment and as we shall amplify hereinafter may reasonably be interpreted to include the associational or corporate structure especially insofar as it is reflected in continuing practices)—might well be thought derelict in the performance of its duties were it to ignore violations of the applicable public policy of 17 M.R.S.A. § 1301–A in deciding whether to issue or renew licenses under 28 M.R.S.A. § 55(8).

We find no plain indication of a legislative purpose to require that contravention of the basic public policy underlying 17 M.R.S.A. § 1301–A must be remedied *exclusively* by the license revocation procedure specified in that statute. On the contrary, the legislative debate reveals a design to establish a broad public policy comprehensively operative as to any person, firm, association or corporation seeking a privilege from the State to sell intoxicating liquors. (See 1969 Legislative Record at pp. 1800 et seq., especially the comments of Senator Mills). To attribute to the Legislature an intention to require the State Liquor Commission to go through the motions of issuing a license to sell intoxicating liquors to an association only to have the association shortly thereafter lose it,

because of the operation of 17 M.R.S.A. § 1301–A and the revocation procedures it delineates, would be to perpetrate a travesty of wasted effort and expense.

Further, we discern no significant difference in impact, relative to the interposition of the Administrative Hearing Commissioner, upon the privileges afforded applicants for liquor licenses should they be deprived of their licenses in the first instance by the utilization of 17 M.R.S.A. § 1301–A in conjunction with 28 M.R.S.A. § 55(8) rather than through a process by which a license issued in the first instance will be revoked pursuant to the policy and revocation procedures specified in 17 M.R.S.A. § 1301–A.

17 M.R.S.A. § 1301–A plainly and explicitly mandates that, as to any license revocation under it, and even though the revocation might be of a liquor license, any provisions prescribed specially as to liquor licenses under 28 M.R.S.A. § 401 are superseded by the generalized procedures of 5 M.R.S.A. Chapters 301–307. Hence, the Administrative Hearing Commissioner will adjudicate as to the denial of the issuance of the license by the State Liquor Commission in the same manner and by the same procedures—under 5 M.R.S.A. Chapters 301–307—as he will adjudicate the revocation of a liquor license already issued but subject to revocation under 17 M.R.S.A. § 1301–A. In terms, therefore, of the nature of the functioning of the Administrative Hearing Commissioner no practical difference eventuates because the State Liquor Commission withholds issuance of the license initially under the impact of 17 M.R.S.A. § 1301–A or allows the license to be issued to be subsequently revoked in accordance with 17 M.R.S.A. § 1301–A.

Having decided that the State Liquor Commission was correct in its conclusion that it had authority to combine 17 M.R.S.A. § 1301–A with 28 M.R.S.A. § 55(8), to arrive at a conclusion denying the issuance or renewal of a liquor license, we turn to evaluate the particular manner in which the Commission exercised such authority in the instant cases.

■ We agree with plaintiffs that an association or corporation does not, as such, possess "good or bad moral" character and, therefore, the Commission assigned an improper reason for the denial of the licenses.

It does not follow, however, that the ultimate action of the Commission in denying the licenses was itself unlawful. We decide that on the record before us the Commission was legally justified in denying the renewal of the licenses to the plaintiffs to sell intoxicating liquors.

■ Although an association, as such, does not have "good or bad moral" character it nevertheless may properly be regarded as having "character", in legal contemplation, and as that concept is utilized in 28 M.R.S.A. § 55(8), such that, independently of considerations of morality, the association's "character" may disqualify it for a license to sell intoxicating liquors in the State of Maine. The structure by which an association is formed or organized is a relevant facet of its essential nature and, therefore, of its "character" in a legal sense. Likewise, its operative policies, especially if they flow from the manner in which the association or corporation has been organized and structured, assume relevant bearing under 28 M.R.S.A. § 55(8) not only as to the "character" of the association but also to the manner in which it will, and even must, be operated. Thus, the "character" and manner of operation of an association are not necessarily mutually exclusive concepts. They may and often do overlap. Such is the situation in the instant cases.

We hold, therefore, that the Commission acted within its legitimate authority in denying to the plaintiffs the renewal of their licenses to sell intoxicating liquors in the State of Maine because the "character" and manner of operation of the applicants were, and would be, in violation of an im-

portant public policy of the State as reflected by 17 M.R.S.A. § 1301–A. Notwithstanding that the Commission might have given a wrong reason, its ultimate action in denying issuance of the licenses to plaintiffs was authorized—as supported on the record by other legal considerations.

It was, therefore, error for the Superior Court to issue the permanent injunctions in effect compelling the State Liquor Commission to issue licenses to the plaintiffs which, in the exercise of lawfully conferred authority, the State Liquor Commission was correct in denying.

The entry (in each case) must be:

Appeal sustained.

ARCHIBALD, J., did not sit.