Nos. 62,681
62,682

Kansas Racing Management, Inc., and Wyandotte County Economic Development Commission, Inc., *Appellants*, v. Kansas Racing Commission; Sunflower Racing, Inc.; The Racing Association of Kansas East, Inc.; Kansas Greyhound Racing, Inc.; Greyhound Racing Charities of Kansas, Inc.; Alabama/Kansas, Inc.; and Kansas Racing Charities, Inc., *Appellees*.

(770 P.2d 423)

344

Opinion filed February 27, 1989.

*Ronald E. Manka,* of Lathrop Koontz & Norquist, of Kansas City, Missouri, argued the cause and *William G. Howard,* of Overland Park, was with him on the consolidated briefs for appellant Kansas Racing Management, Inc.

*George Maier, Jr.,* of Kansas City, argued the cause and was on the consolidated briefs for appellant The Wyandotte County Economic Development Commission, Inc.

*Janet A. Chubb,* assistant attorney general, argued the cause and *Warran D. Wiebe,* assistant attorney general, was with her on the brief for appellee Kansas Racing Commission.

*Daniel B. Denk,* of McAnany, Van Cleave & Phillips, P.A., of Kansas City, argued the cause and was on the consolidated brief for appellee The Racing Association of Kansas East, Inc.

*Robert J. Vancrum,* of Gage & Tucker, of Overland Park, was on the consolidated brief for appellee Sunflower Racing, Inc.

The opinion of the court was delivered by

LOCKETT, J.: Appellants, Kansas Racing Management, Inc., (KRM) and The Wyandotte County Economic Development Commission, Inc., (WCEDC) appeal from an administrative adjudication of the Kansas Racing Commission (Commission) awarding conditional licenses to appellees The Racing Association of Kansas East, Inc., (TRAK East) and Sunflower Racing, Inc., (Sunflower) under the Kansas Parimutuel Racing Act (Act), K.S.A. 1988 Supp. 74-8801 *et seq.* Appellants claim: (1) the Commission's refusal to disclose Kansas Bureau of Investigation (KBI) investigative reports to appellants and the Commission's failure to provide appellants an opportunity to present evidence and witnesses regarding those reports violated statutory law and appellants' due process rights under the Kansas and United States Constitutions; (2) the Commission erred in ruling it lacked jurisdiction to consider an alleged conflict of interest involving one of the principals of Sunflower and the Kansas Attorney General; (3) K.S.A. 1988 Supp. 74-8813(a) and 74-8815(c) were improperly retroactively applied to require appellants to pay the cost of KBI background investigations; and (4) the Commission's grant of conditional facility owner and facility manager licenses to Sunflower and a conditional organization license to TRAK East was arbitrary, capricious, or an abuse of its discretion. Pursuant to our limited scope of review and after careful consideration of all points raised on appeal, we affirm.

In 1986, the Kansas Constitution was amended to allow the

legislature to "permit, regulate, license and tax . . . the operation or conduct, by bona fide nonprofit organizations, of horse and dog racing and parimutuel wagering thereon." Kan. Const. art. 15, § 3b. Subsequently, the 1987 legislature enacted the Kansas Parimutuel Racing Act, K.S.A. 1987 Supp. 74-8801 *et seq.*, effective May 28, 1987, which governs racing activities in the state. The Act creates the Kansas Racing Commission, whose duties include the granting of organization and facility licenses for horse or greyhound racing.

The Act requires any nonprofit organization desiring to conduct racing to obtain a license from the Commission. In addition to conducting races, the Act allows a nonprofit organization to construct and own the racetrack facility or contract with a person, partnership, corporation, or association, the State of Kansas, or any political subdivision of the state (a nonprofit group) to construct and/or own the racetrack facility for the nonprofit organization to conduct racing.

The Act grants the Commission broad discretion in the grant or denial of organizational licenses. K.S.A. 1988 Supp. 74-8813(e) provides that,

"[i]f an application is found to be in compliance [with the provisions of the Act] and the commission finds that the issuance of a license would be within the best interests of horse and greyhound racing within this state from the standpoint of both the public interest and the horse or greyhound industry, *as determined solely within the discretion of the commission,* the commission *may* issue an organization license to the applicant." (Emphasis supplied.)

In other words, the Commission is not statutorily required to grant an organizational license even though the applicant is found to be in compliance with statutory requirements.

At the time appellants filed their applications, K.S.A. 1987 Supp. 74-8813 and 74-8815 set out the procedure for submission of an application for licensure to the Commission. All applicants were required to pay a nonrefundable $5,000 application fee (K.S.A. 1987 Supp. 74-8813[a][1] and 74-8815[c]), and to deposit $500,000 (K.S.A. 1987 Supp. 74-8813[b][1]) and 74-8815[d][1]) to be held by the state treasurer and refunded to the applicant, with interest, if no license was awarded.

Acting upon recommendations of the Commission, the 1988 session of the Kansas Legislature made significant changes in the Act. Although the original legislation (K.S.A. 1987 Supp. 74-8813[e] and 74-8815[e]) required that the denial of an organiza-

tion or an owners' license by the Commission be in accordance with the Kansas Administrative Procedure Act, K.S.A. 1987 Supp. 77-501 *et seq.*, which creates procedural rights and imposes procedural duties upon administrative agencies, this provision was deleted by the 1988 legislature by a substitute for H. B. 2776 in chapter 318. In its place, the legislature provided that: (1) the grant or denial of an original facility owner license or facility manager license shall *not* be subject to the Kansas Administrative Procedure Act; (2) the grant or denial of a license shall be determined in the sole discretion of the Commission; (3) the decision to grant a license to one of two or more competing applicants is final and the Commission is not required to conduct a hearing on the denial of a license to each of the other competing applicants; (4) judicial review of the Commission's decision is by appeal to the Supreme Court in accordance with the act for judicial review and civil enforcement of agency actions; and (5) judicial review is limited to whether the action of the Commission was arbitrary or capricious or constituted an abuse of discretion. K.S.A. 1988 Supp. 74-8813(v), and 74-8815(m).

Because of the expenses incurred by the Commission in processing the applications for licenses and investigating the applicants' qualifications, H.B. 2773 amended the Act effective April 7, 1988, to enable the Commission to apply each applicant's $5,000 fee toward payment of reasonable expenses incurred when processing the application and investigating the applicant's qualifications for licensure. This amendment also required the Commission to charge each applicant for any additional amount necessary to pay these expenses. K.S.A. 1988 Supp. 74-8813(a) and 74-8815(c).

To assist the Commission with its investigation of the qualifications of the applicants, H.B. 2774 was enacted to permit the Commission to receive criminal and background investigation information for purposes of determining the applicants' qualifications for licensure. K.S.A. 1988 Supp. 74-8804(n).

These amendments became effective during the time the Commission was receiving and processing applications for licenses to construct a race facility for greyhound and horse racing in the Kansas City area. The Commission's application and interpretation of the 1988 amendments form the basis for this appeal.

On January 22, 1988, appellant WCEDC, and appellant KRM filed with the Commission a joint application for licenses to construct a racetrack facility and to conduct horse and greyhound racing with parimutuel wagering at a proposed site in Edwardsville, Wyandotte County, Kansas. WCEDC, a Kansas not-for-profit corporation, filed to obtain organization and facility owner licenses. KRM filed for a facility management license.

On March 3, 1988, Sunflower and TRAK East filed with the Commission a joint application seeking licenses to construct a racetrack facility and to conduct horse and greyhound racing with parimutuel wagering at a proposed site in Kansas City, Wyandotte County, Kansas. Sunflower sought both the facility owner and facility manager licenses and TRAK East sought only the nonprofit organization license.

On March 5, 1988, the Commission held a public hearing at Edwardsville, Kansas, concerning the racetrack proposed by KRM and WCEDC. On March 7, 1988, the Commission received two additional group applications from Kansas Greyhound Racing, Inc., and Greyhound Racing Charities of Kansas, Inc.; and Alabama/Kansas, Inc., and Kansas Racing Charities, Inc., seeking racetrack licenses in the Kansas City, Kansas, area.

On March 31, 1988, the Commission entered an order finding that the applications of WCEDC and KRM complied with both the Act and Commission regulations. The same day, the Commission entered similar orders finding all other applications for racetracks in the Kansas City area in compliance. Though statutorily parties to this appeal, K.S.A. 1988 Supp. 74-8813(v) and 74-8815(m), Kansas Greyhound Racing, Inc., and Greyhound Racing Charities of Kansas, Inc.; and Kansas Racing Charities, Inc., and Alabama/Kansas, Inc., have chosen not to participate in the appeal.

The 1988 amendments to the Act became effective during the month of April. From this point on, the Commission applied the Act as amended. On April 25, 1988, the Commission held a public hearing in Kansas City, Kansas, concerning the remaining racetrack proposals in that area, including the proposal of Sunflower and TRAK East.

Between June 17, 1988, and July 8, 1988, the Commission received KBI investigative reports on all applicants. Instead of providing written copies of these reports to the members of the

Commission, the reports were read verbatim to the Commission in executive sessions. Subsequently, portions of the reports were reread to the Commission.

On July 8, 1988, the Commission met in executive session with Sunflower's and KRM's principals regarding their KBI background investigative reports. On July 9, 1988, the Commission met in executive session to confer with principals of KRM and Alabama/Kansas concerning the KBI reports. On that same date in executive session, the Commission discussed the KBI reports with Dr. David A. Schoenstadt and Mr. Norman E. Rose, principals of KRM. That afternoon in a public session, the Commission voted to grant a conditional organization license to TRAK East, and conditional facility owner and facility manager licenses to Sunflower. The Commission instructed its counsel, an assistant attorney general, to draft a proposed order, with findings of fact and conclusions of law, for these licenses.

On July 15, 1988, KRM requested a meeting with the Commission in executive session to comment on the KBI investigative reports. In addition, KRM's counsel delivered to the Commission a letter signed by its chairman, Dr. David Schoenstadt. Counsel for KRM asked that the letter be filed confidentially. The Commission placed these matters on its agenda for the following week. Counsel for both KRM and WCEDC then requested the Commission reconsider its conditional licensure of TRAK East and Sunflower.

On July 22, 1988, following an executive session with its counsel, the Commission ruled in a public session that the letter would not be filed confidentially. The letter was then publicly read. In the letter, KRM raised concerns regarding denial of access to the KBI investigative reports concerning the KRM applicants, an alleged conflict of interest between a principal of Sunflower and the Kansas Attorney General, and the Commission's decision to award the licenses to Sunflower and TRAK East. The Commission ruled the letter raised no issues over which it had jurisdiction. Then, pursuant to K.S.A. 1988 Supp. 74-8815(j), the Commission granted licenses to Sunflower and TRAK East, conditioned upon the filing of final loan documents, closing of the loan, the posting of a surety bond, and the submission to the Commission of copies of all contracts executed by the applicants.

On July 29, 1988, the Commission denied licenses to all other competing applicants. On August 4, 1988, the executive director of the Commission sent letters billing additional KBI investigative costs to license applicants, including $58,864.88 to WCEDC. (This included $27,431.20 for agent salaries, $16,003.63 for travel costs, and $15,430.05 for agency administrative expenses.) Similar letters were sent to the other applicants. KRM and WCEDC filed this appeal on August 19, 1988, raising four issues. Additional facts will be developed where pertinent.

## I. KBI INVESTIGATIVE REPORTS

The 1988 Kansas Legislature amended K.S.A. 1987 Supp. 74-8804 to allow the Commission to obtain background investigative reports on each licensure applicant. K.S.A. 1988 Supp. 74-8804 provides:

"(n) The commission may receive from the Kansas bureau of investigation or other criminal justice agencies such criminal history record information (including arrest and nonconviction data), criminal intelligence information and information relating to criminal and background investigations as necessary for the purpose of determining qualifications of licensees of and applicants for licensure by the commission. Disclosure or use of any such information received by the commission, or of any record containing such information, for any purpose other than that provided by this subsection is a class A misdemeanor and shall constitute grounds for removal from office, termination of employment or denial, revocation or suspension of any license issued under this act. Nothing in this subsection shall be construed to make unlawful the disclosure of any such information by the commission in a hearing held pursuant to this act.

"(o) The commission, in accordance with K.S.A. 75-4319 and amendments thereto, may recess for a closed or executive meeting to receive and discuss information received by the commission pursuant to subsection (n) and to negotiate with licensees of or applicants for licensure by the commission regarding any such information."

Pursuant to this amendment, the Commission recessed into executive session and received information from KBI background investigations of the applicants. Principals of most applicants were subsequently summoned into executive sessions to discuss these background reports. However, WCEDC's principals were neither summoned to discuss their background reports nor granted a meeting. KRM and WCEDC requested but were denied access to the KBI investigative reports without receiving an explanation by the Commission for the denial. However, from the record on appeal, it appears that the Commission's policy was to keep the KBI reports confidential and

only reveal portions of these reports to the various applicants interviewed in executive sessions. It is appellants' contention that the Commission's refusal to disclose these KBI investigative reports violates provisions of the Act, legislative intent, and their constitutional due process rights.

Statutory basis for disclosure

It is the Commission's position that since the Act imposes penalties for disclosure of KBI investigative reports, its disclosure of any information contained within the reports is prohibited. In addition, the Commission argues that its disclosure of any information contained in the criminal investigation records of any law enforcement agency is also prohibited by the Kansas Open Records Act (KORA), K.S.A. 45-215 *et seq*. We disagree with the Commission's narrow interpretation of the acts.

Though the KORA is a general act which requires the records of public agencies to be open to the public, it does not require a public agency to disclose all of the information contained in its records to the public. K.S.A. 1988 Supp. 45-221(a)(10)(A)-(E) specifically provides that a public agency cannot be compelled to disclose criminal investigation records unless an action is first brought for that purpose and the court finds disclosure is in the public interest. However, the statute specifically prohibits the court from requiring the public agency to disclose its criminal investigation records if disclosure would: (1) interfere with prospective law enforcement action; (2) reveal the identity of confidential sources or undercover agents; (3) reveal confidential investigative techniques or procedures; or (4) endanger the life or physical safety of any person.

It is important to note that the KORA defines "criminal investigation records" as records of an investigatory agency or criminal justice agency compiled in the process of *"preventing, detecting or investigating violations of criminal law."* K.S.A. 45-217(b). (Emphasis supplied.) The KORA statutory exemption of criminal investigation information covers records related to the investigation of specific crimes or prospective law enforcement action, such as interviews with witnesses, affidavits, and notes and reports of investigative officers. See Frederickson, *Letting the Sunshine In: An Analysis of the 1984 Kansas Open Records Act*, 33 Kan. L. Rev. 205, 243 (1985).

The Kansas Parimutuel Racing Act, K.S.A. 1988 Supp. 74-

8804(n), allows the Commission to receive from the KBI or other criminal justice agencies "such criminal history record information (including arrest and nonconviction data), criminal intelligence information, and information relating to criminal and background investigations as necessary for the purpose of determining qualifications of licensees of and applicants for licensure by the commission." The amendment also allows the Commission to recess into executive or closed session either to receive the background reports or to "negotiate" with potential licensees regarding the information. The data obtained through the law enforcement investigations supplements information provided by the applicants to the Commission. The statute clearly provides that the information contained in the background investigations may be disclosed by the Commission at any hearing held pursuant to the Act, and provides penalties only for disclosure for any other purpose.

We acknowledge that the KORA contains the legislative statement that it is public policy for the public records of this state to be open for inspection by *any person.* K.S.A. 45-216. *Harris Enterprises, Inc. v. Moore,* 241 Kan. 59, 63, 734 P.2d 1083 (1987). However, contained in the KORA is a restriction upon public access to certain law enforcement information. A plain reading of K.S.A. 1988 Supp. 74-8804(n) indicates legislative intent to make both receipt and disclosure of information contained in background reports of the law enforcement agencies obtained for the Commission discretionary with the Commission. The statute provides that the information contained in background investigations may be discussed with license applicants at closed meetings *or* through regular Commission hearings.

The Kansas Open Records Act is a general act that allows the courts to order disclosure of a public agency's criminal investigation reports, with certain stated exceptions. The Kansas Parimutuel Racing Act is a specific act that allows the Commission to disclose the substance of criminal investigation reports when determining the qualifications of applicants for licenses. The Kansas Parimutuel Racing Act does not require the court to determine whether the public interest would be served by disclosure of the information contained in the law enforcement agency's report to the Commission, but gives the Commission the right to make that decision. Even though the narrow issue

here is disclosure of the information contained in the investigative reports to appellants, the subjects of the reports, we also answer the broader question of the power of the Commission to disclose the reports not only to the applicants, but also to the public.

It is the duty of the court to reconcile different statutory provisions so as to make them consistent, harmonious, and sensible. *NEA-Wichita v U.S.D. No. 259*, 225 Kan. 395, 399, 592 P.2d 80 (1979) (citing *Garden City Educators' Ass'n v. Vance*, 224 Kan. 732, 585 P.2d 1057 [1978]). General and special statutes should be read together and harmonized whenever possible, but to the extent a conflict between them exists, the special statute will prevail unless it appears the legislature intended to make the general statute controlling. *Board of Park Commissioners v. Board of County Commissioners*, 206 Kan. 438, Syl. ¶ 1, 480 P.2d 81 (1971).

The Commission incorrectly determined that written disclosure of any of the information contained in the background investigations in an executive session or at a regular Commission hearing violated the law. Likewise, appellants' claim that the legislature removed all restraints of the KORA on the Commission when it enacted the Parimutuel Racing Act is incorrect. Subject to specified restrictions, disclosure of KBI investigative reports to racing license applicants is permitted both under K.S.A. 1988 Supp. 74-8804 (n) and (o) and under the KORA. The Commission may but is not required to disclose information contained in the law enforcement agency's report that it determines is in the public interest if disclosure of that information does not violate the provisions of K.S.A. 1988 Supp. 45-221(a)(10)(A)-(E) by: (1) interfering with prospective law enforcement action; (2) exposing the identity of a confidential source or undercover agent; (3) revealing a confidential investigative technique or procedure not known by the applicant; or (4) endangering the life or safety of a person. Therefore, the Commission's decision to disclose the substance of the reports only to certain applicants in executive sessions was one of its options under the law.

## Due process

Appellants argue that the Commission's refusal to disclose the KBI background investigations violated their due process rights

under the Kansas and United States Constitutions. Initially, our analysis of this due process claim requires us to examine the nature of an applicant's interest in the grant of a license under the Act. The Fourteenth Amendment to the United States Constitution provides that no state can "deprive any person of life, liberty or property, without due process of law." Section 18 of the Bill of Rights of the Kansas Constitution provides that "[a]ll persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

Appellants claim that their license applications created both a protected property and liberty right in being awarded the licenses. When an interest involving life, liberty, or property is implicated, due process considerations apply. However, a protected due process right must encompass an interest recognized by the Constitution. *Harrison v. Long*, 241 Kan. 174, 178, 734 P.2d 1155 (1987) (citing *Sinclair v. Schroeder*, 225 Kan. 3, 8, 586 P.2d 683 [1978]). To prevail on their due process claim, appellants must show that they possess a definite liberty or property interest and that this interest was abridged, under color of state law, without appropriate process. See *Board of Regents v. Roth*, 408 U.S. 564, 569-79, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972).

To establish a property interest in a particular benefit, appellant must have a "legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. at 577. A person's interest in a benefit becomes a property interest for due process purposes if there are "rules or mutually explicit understandings" that support the claim of entitlement to the benefit and that the person may invoke at a hearing. *Perry v. Sindermann*, 408 U.S. 593, 601, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972). Without the existence of such rules or understandings, the person has only an abstract desire for or a unilateral expectation of the benefit. *Board of Regents v. Roth*, 408 U.S. at 577.

In support of the claim that an applicant for a license under the Act has a property interest in the granting of the license, appellants cite *Rydd v. State Board of Health*, 202 Kan. 721, 451 P.2d 239 (1969). A careful analysis of *Rydd* demonstrates that it does not bear the "striking similarity" to this case claimed by appellants. *Rydd* involved the State Board of Health's denial of the appellant's application for state licensure of a group day care

home without notice or a hearing. The Board's reason for denial of the license was that the applicant would "not be able to give the proper amount of time" to the children nor "be of the proper temperament for looking after children." 202 Kan. at 723.

Determining that Rydd's due process rights had been violated by the lack of notice and hearing, we observed that the license for a day care center was within the category of licenses which the State must grant if the applicant meets certain minimum requirements. We further noted that similar results had been reached in other cases involving the denial of licenses to practice law, an accountant's license to practice before the United States Board of Tax Appeals, and a license to conduct an employment agency based on the applicants' personal unfitness. 202 Kan. at 726-28, and cases cited therein. Then, after characterizing the denial of the licensure as based on an adjudication of the applicants' individual fitness and character, we held that procedural due process requires notice and an opportunity to be heard "before [an applicant] may be denied a license on the ground of personal unfitness." 202 Kan. at 730.

Here, the denial of the license to the appellants was not premised on the applicants' unfitness of character. More importantly, the license sought in *Rydd* belongs to that category of licenses which the State must grant if the applicant meets certain minimum requirements. In *Rydd*, the applicant for the day care license had a legitimate claim of entitlement to the license, assuming she met the statutory requirements for licensure. In contrast, here, the applicants are *competing* for licensure and the statute gives the Commission broad discretion to grant or deny a license to any or all of the applicants, even if the applicants have complied with statutory requirements. K.S.A. 1988 Supp. 74-8813(e) clearly provides:

"If an application is found to be in compliance and the commission finds that the issuance of the license would be within the best interests of horse and greyhound racing within this state . . . as determined solely within the discretion of the commission, the commission *may* issue an organization license to the applicant." (Emphasis supplied.)

In a recent case, *Curtis Ambulance v. Shawnee Cty. Bd. of Cty. Com'rs*, 811 F.2d 1371 (10th Cir. 1987), the Tenth Circuit Court of Appeals refused to recognize that a disappointed low bidder for a county ambulance contract had a property interest in receiving the contract. As that court noted, state law gave the board

of county commissioners broad discretion in rejecting any and all bids. Since the appellant could point neither to any state law or mutually explicit understandings giving rise to a legitimate claim of entitlement to an award of the contract, nor to any local or state rules "which sufficiently circumscribe the Board's authority to award the contract in dispute," Curtis had only a "unilateral expectation" of receiving the ambulance contract. 811 F.2d at 1384-85.

Since the discretion of the Commission to grant a license to conduct racing activities is similarly unrestricted by 74-8813, no applicant can claim an entitlement or property interest in acquiring such a license. The choice of one applicant over another or the decision not to issue a license to any applicant is fully discretionary and is limited only by the arbitrary and capricious standard of K.S.A. 1988 Supp. 74-8813(v) and 74-8815(m).

Appellants also claim they were entitled to due process protection because they possess a protected liberty interest. The concept of "liberty" is broad and includes the freedom to work and the protections of the person's good name. See *Board of Regents v. Roth*, 408 U.S. at 573. A person may be deprived of a "liberty" interest without due process if that person's standing in the community is damaged; if his reputation, honor, or integrity are questioned; or if a stigma or other disability is imposed upon him which forecloses his freedom to obtain and hold another job. *Sinclair v. Schroeder*, 225 Kan. 3, 9, 586 P.2d 683 (1978).

In support of their claim of infringement upon their liberty interest, appellants note comments in the press regarding the KBI investigations and one comment made by the Chairman of the Racing Commission regarding the confidentiality of the KBI reports. Appellants then cite an Alabama statute which appears to provide that Alabama would deny licenses to appellants based on the denial of a similar license by the Kansas Racing Commission. Nothing in the public record has revealed any stigma to appellants as a result of the licensure process. The Commission made no finding of unfitness and, in fact, most members commented on the record about the excellent quality of *all* the applicants. Further, since the Commission had the discretion not to issue any license, appellants' failure to obtain a discretionary Kansas license and the possibility that they may be precluded from receiving a racing license in another state does not demonstrate appellants were deprived of a protected liberty interest.

Appellants have failed to show either a protectable property or liberty interest under the Act which entitles them to due process protections. We note that a similar result was reached in *Medina v. Rudman*, 545 F.2d 244 (1st Cir. 1976), *cert. denied* 434 U.S. 891 (1977). In *Medina,* plaintiff instituted a civil rights action against the New Hampshire State Greyhound Racing Commission and the state attorney general after her application to participate in the ownership of an outstanding greyhound license was denied. In affirming the lower court's dismissal of the complaint, the First Circuit Court of Appeals distinguished those license cases which involve "broadly shared privileges essential in the pursuit of earning a livelihood," 545 F.2d at 249-50, and commented on the rationale behind the broad discretion granted to the agency empowered to regulate the unique enterprise of racing:

"[R]acing licenses have not been viewed by the New Hampshire courts as open to all persons who meet prescribed standards. Rather they are treated as discretionary with the racing Commission. The statute says only that the Commission '*may*' issue a license if satisfied that all provisions of law and its rules and regulations have been and will be complied with. NH RSA 284:16-a (Supp. 1975). Referring to a horse racing license, the New Hampshire Supreme Court has rejected a claim that once an applicant complies with the statutes and meets all requirements, the commission had no discretion to withhold a license. *North Hampton Racing & Breeding Assoc. v. New Hampshire Racing Commission,* 94 N.H. 156, 48 A.2d 472 (1946). The court explained that the state horse racing statute, on which the greyhound racing laws are patterned

'deals with a private enterprise which, of its nature, is not only privileged, but which presents a social problem properly coming under the exercise and jurisdiction of the police power of the state and which requires strict regulation and supervision.' *Id.* at 159, 48 A.2d at 475.

In *Ratti v. Hinsdale Raceway,* 109 N.H. 270, 272, 249 A.2d 859, 861 (1969), the court said that racetracks were permitted by the state to raise revenue, and that regulation allowed tracks to be run by private parties while guarding against 'whatever social evils may be involved.'

"We think that New Hampshire, in its greyhound licensing laws, rather than creating a general entitlement in favor of all persons who qualify, has indicated merely that the Commission may issue licenses 'at will'. [Citations omitted.] We concluded, therefore, that Mrs. Medina's desire to participate in the ownership of a greyhound parimutuel track did not enjoy, either explicitly or implicitly, a protected status under New Hampshire law, and was not on that theory, a 'liberty' or 'property' interest." 445 F.2d at 251.

Further indicating that the legislature did not intend that an application under the Act created a liberty or property interest, K.S.A. 1988 Supp. 74-8815(1) provides:

"The refusal to renew a facility owner license or a facility manager license shall be in accordance with the Kansas administrative procedure act and shall be subject to review under the act for judicial review and civil enforcement of agency actions."

Here, the legislature clearly recognized that, once the facility owner license or the facility manager license is issued, the holder of that license has a property right and, if the Commission refuses to renew that license, the holder has a protected right to notice and a due process hearing.

We recognize there are instances where the interest of an applicant for licensure rises to the level of a constitutionally protected property or liberty interest. Those rights evolve where state laws provide that a license shall be conferred on those who meet specific minimum standards. Here, the Kansas Parimutuel Racing Act creates no similar entitlement. Licenses issued by the Commission under the Act were never intended to be issued to all persons who meet prescribed standards. Instead, the legislature stated that the issuance of the licenses was discretionary with the Commission. The statute merely states that the Commission 'may' issue a license if satisfied that the applicant has complied with the provisions of the Act and that the issuance of a license would be in the best interests of horse and greyhound racing within this state from the standpoint of both the public interest and the horse and greyhound industry, as determined solely within the discretion of the Commission. The legislature intended that, even where one or all of the applicants meet the requirements, the Commission has discretion to withhold a license. Therefore, appellants' claim fails to establish a property or liberty interest.

## II. JURISDICTION TO CONSIDER ALLEGED CONFLICT OF INTEREST

Appellants next contend that the Commission erred when it ruled it lacked jurisdiction to consider an alleged conflict of interest involving the Attorney General and a principal of Sunflower Racing. On July 9, 1988, the Commission voted to grant conditional organizational and facility licenses to Sunflower and TRAK East and requested its counsel to draft an order containing findings of fact and conclusions of law. On July 15, 1988, appellant KRM submitted a letter to the Commission, alleging

improprieties in the licensing process, and requested the letter be filed confidentially. On July 22, 1988, after ruling the letter would be filed publicly, the Commission had the letter read into the record and then ruled it had "no jurisdiction" to consider the issues raised.

It is the appellants' position that the Commission had jurisdiction to hear and decide the allegations raised by the letter under the doctrine of "primary jurisdiction," citing *Western Kansas Express, Inc. v. Dugan Truck Lines, Inc.*, 11 Kan. App. 2d 336, 720 P.2d 1132 (1986). We disagree. This doctrine only applies to determine jurisdiction between an agency and a court when both have concurrent jurisdiction over an action and thus is not applicable to this case. The doctrine is invoked when the courts have initial jurisdiction over a claim but when it is likely that the action will require resolution of issues which, under a regulatory scheme, have been placed in the hands of the administrative body. The doctrine usually relates to particular issues in the proceeding rather than the entire proceeding and typically operates through a suspension of the judicial process pending referral of such issues to the administrative agency.

It is the Commission's position that, since the appellants raised these issues after the Commission had announced its intention to award the conditional licenses to Sunflower and TRAK East, appellants' July 15 letter constituted a request for review of the licensing decision. Since K.S.A. 1988 Supp. 74-8813(v) provides that *any* act for judicial review shall be by appeal to the Supreme Court, the Commission determined it had no jurisdiction to consider these issues after it announced its intention to license other applicants.

The Commission failed to note that K.S.A. 1988 Supp. 74-8813(v) provides that the decision on licensure "shall be final upon *the grant* of a license to one of two or more competing applicants." Therefore, the Commission's decision was not final on July 9 when the Commission voted to grant the licenses to Sunflower and TRAK East. The decision became final on July 22, 1988, when the Commission filed its order. Therefore, the Commission did have jurisdiction to consider the issues raised by appellants' letter. During oral argument to this court, the Commission conceded, even under its interpretation of the Act, that it retained jurisdiction to determine the issues until it granted the final licenses on July 22, 1988.

In addition, jurisdiction for the Commission to review a license after it has been granted is contained in the Act, specifically K.S.A. 1988 Supp. 74-8813(i), which provides that the Commission "may review an organization license more often than annually upon its own initiative or upon the request of any interested party." The legislature intended that the Commission have continuing jurisdiction to review a license if there are claims that the license holder has failed to comply with all the provisions of the law or the Commission's rules and regulations, or has failed to meet the statutory requirements for the issuance of a license. This statutory authority makes such review discretionary with the Commission. Therefore, the Commission does indeed have statutory jurisdiction to consider issues concerning the qualifications of an applicant for a license raised after the order granting the license becomes final.

We now must consider the substance of appellants' July 15 letter in which KRM alleged a conflict of interest between Attorney General Robert T. Stephan and a principal of Sunflower, R. D. Hubbard; bias on the part of Assistant Attorney General Janet A. Chubb; an improper connection between Sunflower and a funding source identified as "Delaware North"; and that the appellees had been "whitewashed" and the appellants "blackwashed" in the licensing process. Appellants requested a second background check to be performed by the Kansas Highway Patrol, an opportunity to review the KBI investigations, an opportunity to present evidence, an identification of the source of all loans, an examination into the "Delaware North" entity, the removal of Assistant Attorney General Chubb, and a delay of the final decision. After Chairman Alfred G. Schroeder commented that the letter appeared to be an attack on the successful applicants, the Commission ruled that the letter raised issues not under its jurisdiction and that it was not in a position to take further action. On appeal, in their briefs, appellants have chosen to address only the alleged conflict of interest.

The alleged conflict stems from the fact that a 50% shareholder of Sunflower, Inc., R. D. Hubbard, contributed $10,000 to settle a sexual harassment suit involving the Kansas Attorney General, Robert Stephan, and that Hubbard and Stephan were partners in a business venture. As a result of the state-wide media coverage,

the general public was aware of Hubbard's contribution to the settlement of the lawsuit against the attorney general in 1986. Information that Hubbard and Stephan were partners in a business venture is also contained in various public records. We observe that, although facts regarding the business venture were public record and the settlement of the sexual harassment suit had received extensive publicity, appellants sat through eleven months of hearings and chose not to raise the issue until one week after the Commission announced that it would award the licenses to other applicants.

We have reviewed the record on appeal and find that the Commission was notified of Hubbard's personal and business relationship with the attorney general when Hubbard disclosed the payment and the business connection to the KBI during its background investigation of Hubbard and later when Hubbard appeared before the Commission during an executive session. The record shows that the Commission carefully considered the connection between Hubbard and the attorney general after it was disclosed to the Commission in September 1987, and determined that the relationship did not affect the merits of Sunflower's application. We have found nothing in the record to indicate that the Commission's determination of this issue was incorrect.

We must now recall that the Commission initially concluded that provisions of the Open Records Act and the Parimutuel Racing Act precluded disclosure of *any* information contained in the KBI report. Had the Commission avoided this narrow interpretation of the two acts and informed both the appellants and the public that it had previously considered the conflict of interest issues raised in KRM's letter during executive sessions, it would have been unnecessary for the appellants to raise the conflict of interest issue on appeal. Release of this information by the Commission to the public would not have violated the restrictions of the KORA and would have made both the appellants and the public aware of the depth of the Commission's investigation of Hubbard's background.

Finally, we must also reject appellants' allegation that, since the attorney general is the statutory head of the KBI, this relationship tainted the KBI investigations as well as the conduct of the two assistant attorneys general assigned as counsel to the

Commission. We note that appellants rely on an "appearance of impropriety" argument and present no facts to substantiate their allegations, specifically how the alleged bias influenced any of the five Commission members. Appellants have failed to recognize that the legislature specifically directed the attorney general to appoint "not more than two assistant attorneys general who shall be assigned to assist the commission in all matters." K.S.A. 1988 Supp. 74-8809. In addition, pursuant to the Kansas Code of Professional Responsibility, those assistant attorneys general who were appointed to assist the Commission are solely responsible to the Commission. We find this contention to be without merit.

## III. RETROACTIVITY OF 1988 AMENDMENT
## REQUIRING APPLICANTS TO PAY ADDITIONAL FEES

In January 1988, when appellants' applications were filed, both K.S.A. 1987 Supp. 74-8813 and K.S.A. 1987 Supp. 74-8815 provided that the applications be accompanied by a nonrefundable fee of $5,000 and further provided that if a facility owner applicant planned to construct a racetrack, the applicant must deposit $500,000 with the Commission. K.S.A. 1987 Supp. 74-8813(a) and 74-8815(c) were amended effective April 7, 1988, as follows:

"If the application fee is insufficient to pay the reasonable expenses of processing the application and investigating the applicant's qualifications for licensure, the commission shall require the applicant to pay to the commission, at such times and in such form as required by the commission, any additional amounts necessary to pay such expenses. No license shall be issued to an applicant until the applicant has paid such additional amounts in full, and such amounts shall not be refundable except to the extent that they exceed the actual expenses of processing the application and investigating the applicant's qualifications for licensure." K.S.A. 1988 Supp. 74-8813(a) and 74-8815(c).

The background investigations began on March 7, 1988. On August 4, 1988, the Commission notified WCEDC and KRM that the additional cost for background investigations totalled $58,864.88 and requested payment of this amount. Only the costs incurred in investigations conducted after the effective date of the amendment were included in the amount charged.

It is appellants' contention that the assessment of additional fees is an impermissible retroactive application of the 1988 amendment which disturbs rights vested before the effective date of the amendment. Appellants reason that the amendment

may only be applied to those who submitted applications to the Commission after the effective date of the amendment. The Commission argues that the applicants' interest in the license fees is not a vested right and, in the alternative, that the assessment of costs incurred after the effective date of the Act is a prospective application of the amendment.

A retroactive law is one which takes away or impairs vested rights acquired under existing laws, or creates a new obligation and imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past. 73 Am. Jur. 2d, Statutes § 348, p. 486. A statute operates prospectively unless its language clearly indicates a legislative intent that it operate retroactively. This rule is normally applied when an amendment to an existing statute or a new statute is enacted which creates a new liability not existing before under the law or which changes the substantive rights of the parties. *Davis v. Hughes*, 229 Kan. 91, 101, 622 P.2d 641 (1981) (citing *Nitchals v. Williams*, 225 Kan. 285, 590 P.2d 582 [1979]). However, when a change in the law merely affects the remedy or law of procedure, all rights of action will be enforced under the new procedure without regard to whether they accrued before or after such change of law. *Nitchals v. Williams*, 225 Kan. at 291.

The act of filing an application for a racing license fails to generate any vested rights as long as the application is still pending. Specifically, the appellants had no vested rights in the amount of the application fee while their applications were pending before the Commission. Furthermore, the statute is procedural and merely sets out the steps an applicant must follow when requesting a license from the Commission. We observe that, prior to the effective date of the amendment, any of the applicants could have withdrawn its application and escaped the additional cost. Instead, each applicant chose to proceed in the hope of obtaining a license. Finally, since the appellants were only charged for costs incurred after the effective date of the amendment, the application of the amendment was prospective.

### Arbitrary and Capricious

Appellants claim that the Commission's decision to award the organization license to TRAK East and the facility manager and owner license to Sunflower was arbitrary, capricious, and an

abuse of discretion. It is important to recognize that the legislature has limited our scope of review of grants or denials of original licenses under the Act.

K.S.A. 1987 Supp. 74-8813 and 74-8815 originally provided that denials of organization as well as facility manager and owner licenses would be governed by the Kansas Administrative Procedure Act, K.S.A. 1987 Supp. 77-501 *et seq.* This language was repealed in 1988, and 74-8813 and 74-8815 were amended with identical language as follows:

"The grant or denial of an original organization license shall not be subject to the Kansas administrative procedure act. Such grant or denial shall be a matter to be determined in the sole discretion of the commission, whose decision shall be final upon the grant of a license to one of two or more competing applicants without the necessity of a hearing on the denial of a license to each other competing applicant. Any action for judicial review of such decision shall be by appeal to the supreme court in accordance with the act for judicial review and civil enforcement of agency actions, except that the scope of review shall be limited to whether the action of the commission was arbitrary or capricious or constituted an abuse of discretion. All competing applicants for the organization license shall be parties to such appeal. Any such appeal shall have priority over other cases except those having statutory priority." K.S.A. 1988 Supp. 74-8813(v) and 74-8815(m).

The legislative intent in enacting this amendment is clearly to expedite any appeals of licensing decisions so that construction of the racing facilities can proceed in a timely manner. This intent is further demonstrated by the legislature's narrowing of our original scope of review under the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-621(c), which provides:

"(c) The court shall grant relief only if it determines any one or more of the following:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial

review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

Pursuant to the legislature's amendment to the Act, our review is limited to a determination only of whether the Commission's decision was "arbitrary or capricious or constituted an abuse of discretion." K.S.A. 1988 Supp. 74-8813(v) and 74-8815(m).

Under our limited scope of review of the Commission's grant of a license, the arbitrary and capricious test relates to whether that particular action should have been taken or is justified, such as the reasonableness of the Commission's exercise of discretion in reaching the determination, or whether the agency's action was without foundation in fact. *Pork Motel, Corp. v. Kansas Dept. of Health & Environment,* 234 Kan. 374, 381, 673 P.2d 1126 (1983). Arbitrary or capricious conduct may be shown where an administrative order is not supported by substantial evidence. *U.S.D. No. 461 v. Dice,* 228 Kan. 40, 50, 612 P.2d 1203 (1980) (citing *Neeley v. Board of Trustees, Policemen's & Firemen's Retirement System,* 212 Kan. 137, Syl. ¶ 3, 510 P.2d 160 [1973]). "Substantial evidence" is evidence which possesses both relevance and substance, and which furnishes a substantial basis of fact from which the issues can be reasonably resolved. *In re Petition of City of Shawnee for Annexation of Land,* 236 Kan. 1, 21, 687 P.2d 603 (1984).

This court may not try the case de novo or substitute its judgment for that of the administrative agency. *In re Certif. of Need App. by Community Psychiatric Centers, Inc.,* 234 Kan. 802, Syl. ¶ 2, 676 P.2d 107 (1984). A rebuttable presumption of validity attaches to all actions of an administrative agency and the burden of proving arbitrary and capricious conduct lies with the party challenging the agency's actions.

Appellants contend initially that the order in question is arbitrary and capricious since it is not based on sufficient findings of fact. Appellants cite the following language from *Blue Cross & Blue Shield v. Bell,* 227 Kan. 426, 607 P.2d 498 (1980):

"An administrative agency must assume the responsibility of expressing the basic facts on which it relies with sufficient specificity to convey to the parties, as well as to the court, an adequate statement of the facts which persuaded the agency to arrive at its decision. Thus, there must be findings on all applicable standards which govern the agency's determination, and the findings must be expressed in language sufficiently definite and certain to constitute a valid basis

for the order, otherwise the order cannot stand. [Citation omitted.] Findings of ultimate fact expressed in the language of the applicable statute are not enough in the absence of basic findings to support them." 227 Kan. at 433-34.

In *Blue Cross*, the applicable statute *required* the agency to make specific findings when denying a filing requesting an insurance rate increase. Similarly, in *In re Tax Appeal of Horizon Tele-Communications, Inc.*, 241 Kan. 193, 734 P.2d 1168 (1987), the applicable statute required the Kansas Board of Tax Appeals to make written findings forming the basis for its determinations. We held that, although a more detailed and specific order would have been preferable, the order did contain sufficient facts and the record contained sufficient evidence supporting the agency's conclusions. 241 Kan. at 197.

Here, the Act has no requirement that the Commission make written findings of fact. Specific findings of fact by an administrative agency, while desirable in contested matters, are not indispensable to a valid decision in the absence of a statute or rule requiring them. *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.*, 217 Kan. 546, Syl. ¶ 9, 539 P.2d 1 (1975). The Act does enumerate the qualifications for successful licensure and provides a list of factors which the Commission shall consider in reaching its decision. The Commission's order demonstrates compliance with the statutory criteria and factors.

We observe that the Commission's order does not undertake a comparison of the competing applicants; however, there is no statutory requirement to do so. The order emphasizes that two of the primary considerations in awarding the licenses to TRAK East and Sunflower were the proposed dual horse and greyhound facility track and the fact that TRAK East's principals planned to invest $12.9 million of their own funds toward the project. Although the order could have been more specific, considering the unusual discretion vested in the Commission and considering the record as a whole, the order was supported by substantial evidence.

K.S.A. 1988 Supp. 74-8813(e) authorizes the Commission to grant licenses if it finds that the issuance would be "within the best interests of horse and greyhound racing within this state from the standpoint of both the public interest and the horse or greyhound industry, as determined solely within the discretion of the commission." For their final point on this issue, appellants contend that, despite the broad authority vested in the Commis-

sion, the grant of the licenses to TRAK East and Sunflower was an abuse of discretion.

Appellants premise this argument on the allegation that the Commission "disregarded material, knowing misrepresentations and omissions in the conditional licensees' application." While we note that appellants have combed the record to discover discrepancies in documents submitted to the Commission, we cannot assume that these discrepancies were "disregarded," but rather that the Commission considered them and found them immaterial to their decision.

Appellants rely on K.S.A. 1988 Supp. 74-8813(j)(5), which provides that the Commission may suspend or revoke an organization license or impose a civil fine for violations including "providing to the commission any information material to the issuance, maintenance or renewal of the licensee's license knowing such information to be false or misleading." Appellants' reliance on this provision of the Act is misplaced. The provision does not enable appellants to raise these issues on appeal nor does it prescribe penalties for violations occurring during the licensing process. Rather, the provision gives the Commission discretion to penalize licensees as it sees fit after it becomes aware of possible violations.

The alleged misrepresentations are as follows:

1. TRAK East stated in its application that it had not been reincorporated or reorganized during the last five years. Appellants point out that an entity known as The Racing Association of Kansas East was incorporated in Johnson County May 1987 and dissolved in January 1988. Thereafter, another entity, The Racing Association of Kansas East was incorporated in Wyandotte County. It is TRAK East's position that the second entity was separate and distinct, with different incorporators, and that any omission on the application was inadvertent. What appellants fail to show, in any case, is how the earlier brief incorporation, with dissolution occurring before the corporation conducted any business, could have been material to the application process or material to the Commission's proper determination of TRAK East as a bona fide nonprofit corporation.

2. Appellants argue that contracts between TRAK East and Sunflower, which it alleges existed before the applications were filed, also affect the nonprofit status of TRAK East as well as the

financial projections of Sunflower and TRAK East. Appellants point to a certified audit performed by Arthur Andersen & Co. covering the period July 11, 1986, to December 31, 1987, which indicates that executed contracts may have existed between TRAK East and Sunflower prior to March 1, 1988, which was the date of execution identified by both parties at the time of application. TRAK East and Sunflower maintain the auditors received final drafts of the contracts which were executed on March 1, 1988. Again, although appellants may have discovered a discrepancy in dates, they have not shown how the discrepancy would be material to the licensing decision. Further, since all the documents establishing the alleged inconsistent dates were before the Commission during the licensing process, we can assume the Commission did not consider the discrepancy to be material.

3. Appellants also claim that Sunflower failed to provide documentation for a loan of $1.75 million from Southeast Bank of Miami, Florida, which was guaranteed by Sunflower's stockholders, as required by K.A.R. 112-3-8(q)(13) and (14). They concede, however, that the loan was disclosed and they do not allege any discrepancy between the disclosure and the documents. Again, the Commission appears not to have considered this technical noncompliance to be material.

4. Appellants allege that Sunflower knowingly failed to disclose subordinated debt agreements between R. D. Hubbard, Richard J. Boushka, and Sunflower as well as a contract or option to purchase whereby Hubbard acquired 10% of Boushka's interest in Sunflower. However, an order dated October 28, 1988, reveals that all the documents evidencing these transactions were executed after the conditional license was awarded and that each was presented to the Commission and approved in the order.

5. Finally, appellants contend that the awarding of the licenses to TRAK East and Sunflower was an abuse of discretion because appellants were the better applicants. They argue that a comparison of the competing applications demonstrates that the Commission "disregarded the interests of the horse and greyhound industries and the public interest in maximizing charitable returns." KRM bases this argument on a comparison of all four applicants prepared by one of its principals, Norman Rose, which it claims demonstrates the superiority of their facility over

that of the licensees' in the following particulars: WCEDC, rather than private developers, would own the facility; more charitable funds would accumulate since WCEDC would receive a greater percentage of gross handle than TRAK East; and WCEDC's facility would be less expensive and generally more benefits would devolve on the community than on private developers.

It must be remembered that the legislature delegated to the Commission the task of selecting licensees from a group of qualified applicants. The legislature presumably vested the Commission with the sole discretion for issuing licenses because of the expertise it possesses in this area. In performing this task, the Commission had to balance many competing interests, which we cannot reweigh on appeal. It would have been easier for this court to review the decision below had the Commission's order provided a more detailed reasoning for its choice. However, it is clear that the Commission found the personal investment of $12.9 million by the principal shareholders of Sunflower and the proposed dual racetrack facility to be important factors in the licensing decision.

We cannot substitute our judgment for that of the Commission, but may only review its decision to determine whether it was arbitrary, capricious, or an abuse of discretion. Considering our limited scope of review on this issue, it cannot be said that the Commission abused its broad discretion in awarding the licenses to TRAK East and Sunflower. We find the Commission's grant of the organization license to TRAK East and the facility manager and owner licenses to Sunflower was neither arbitrary or capricious nor an abuse of its discretion.

Affirmed.